# GUNDA GOAR v. VILLAGE OF STEPHEN AND ANOTHER.[1]

November 30, 1923.

No. 23,586.

**Statutory notice of injury sufficient.**

    1. Notice of injury from electrical burns, describing them and claiming that they were caused "as the natural consequence of * * * some defect in the wiring system and equipment" of the electric plant belonging to defendant village, and that the injuries were the result of the negligence of the village, its officers and employes, *held* a sufficient compliance with the statute. G. S. 1913, § 1786.

**Municipality negligent in failure to inspect.**

    2. A municipal corporation maintaining an electric distributing plant owes to the public the duty of so inspecting and maintaining the same as to prevent change and deterioration from natural causes resulting in a dangerous condition. Where injury occurs because of a defect which could have been prevented by inspection, and there is a total failure to inspect for 17 months, the municipal corporation is negligent and liable accordingly.

**Res ipsa loquitur applicable to escape of high power current.**

    3. The rule, res ipsa loquitur, is applicable where, in such a case, a user of the electric current is injured by the escape into a dwelling of a high voltage current.

**Question of negligence in construction one of fact.**

    4. Where primary and secondary electric wires are placed in such juxtaposition that, although the initial clearance is safe, it might have been foreseen that, through natural causes, it would become so lessened as to be dangerous, and where a somewhat different but slightly more expensive method of construction would have prevented all danger, the question of negligence is one of fact.

**When defect in construction is not proximate cause of injury.**

    5. But even where there is such a defect of construction, not presently and imminently dangerous when the contractor delivers and the owner accepts the work, and through natural causes the clearance be-

[1]Reported in 196 N. W. 171.

tween the wires is lessened and contact results so that the insulation is worn away and the resulting electrical connection sets at large the primary current and injury results; the original defect of construction is not the proximate cause, where, for more than 17 months after its acceptance of the plant, the municipal corporation owning and operating the system has wholly failed to make any inspection to discover and guard against such conditions. That negligence, though passive, is the proximate cause—as much so as though it had been active.

Action in the district court for Marshall county to recover $25,000 for injuries received while operating an electric iron. The case was tried before Watts, J., who at the close of the testimony denied separate motions of defendants for a directed verdict, and a jury which returned a verdict for $12,500. From orders denying their motions for judgment notwithstanding the verdict but granting their motions for a new trial unless plaintiff consented to a reduction of the verdict to $8,500, defendants took separate appeals. Affirmed as to the village; reversed as to the company.

B. B. Brett and W. E. Rowe, for appellant village.

Lancaster, Simpson, Junell & Dorsey, for appellant company.

H. O. Chommie, Julius J. Olson and Rasmus Hage, for respondent.

STONE, J.

Action for personal injuries caused by electrical burns, wherein plaintiff had a verdict against both defendants, the village of Stephen, a municipal corporation, and Minnesota Electric Distributing Company. The business of the latter corporation is the installation of electric distributing plants and the generation and distribution of electricity in the territory served by it, which includes the village of Stephen.

Each defendant moved separately in the alternative for judgment notwithstanding the verdict or a new trial. The motions were denied upon condition that plaintiff consent to a reduction of the $12,500 verdict to $8,500. She so consented, but both defendants have appealed.

While in her own home in Stephen, plaintiff was injured on August 10, 1922, by a high voltage current, for the escape of which,

from its proper conductors into the Goar dwelling, one or both of the defendants is responsible. For convenience, we refer to the parties as plaintiff, the village and the company.

The village maintains its own electric distributing plant. The current is generated by the company, sold to the village and delivered through a master meter situated on the village boundary. The property of the company in and its control of the current end at this master meter. The village takes it there, as its own property, and sells and distributes it to its inhabitants.

Formerly the village had an electric generating plant of its own, the use of which has been discontinued. In September, 1920, the company, as an independent contractor, undertook to reconstruct the distributing system of the village, according to plans and specifications prepared by the company for and accepted by the village. At the same time, apparently as a part of the same transaction, a contract was entered into for the sale of current by the company to the village.

The construction contract contains this:

"The contractor shall guarantee all apparatus and appliances and everything else shown herein and in drawings to be free from defects of any kind for a period of one (1) year from date of acceptance and shall make all repairs, adjustments and renewals for a period of one (1) year free of charge."

The work of construction was completed and the plant turned over to and accepted by the village on or about March 1, 1921. At or about that time, a representative of the company made a final inspection of the job, since which the company has had nothing to do with the plant or any part of it. It was not called upon, under its contract guarantee or otherwise, to make good any defects or do any work of repair, adjustment or renewal.

The accident occurred on August 10, 1922, approximately seventeen and one-half months after completion of the reconstruction and its acceptance by the village.

A part of the village plant was a transformer pole near plaintiff's home. It had three sets of double cross arms, in addition to and above those which carried the two transformer boxes. The top

of the pole is about 30 feet from the ground. The top pair of cross arms run east and west and carry 5 high tension (2,300 volt) wires. The next lower pair of cross arms are at right angles to the upper set and carry 6 low tension service lines running east and west. Below these is a third pair of cross arms set in the same direction as the topmost pair and again carrying service wires running in a northerly and southerly direction. Next on the pole are 2 short cross arms, and, immediately below, a single cross arm, which support two transformer boxes, one on either side of the pole.

The function of the transformers is to "step down" the 2,300 volt current to one of 220 or 110 volts. The current is taken from the primary wire to the transformer box by means of "jumper" wires. On this pole there were 2 of them, one extending from each end of the transformer cross arms. The high tension wires coming from the south, and the service lines leading to the east, were "dead headed" on this pole. On the one remaining wire-bearing pair of cross arms, the third from the top, there were 5 service lines which reached to other poles and to a considerable distance each way, north and south.

In this situation it was necessary that the "jumper" wire, extending downward from the east end of the upper cross arms to the same end of the transformer cross arms directly beneath it, be taken around or through the 6 service lines "dead headed" on the second pair of cross arms from the top and extending easterly therefrom. In this case, the "jumper" wire was carried downward between the 2 middle of the 6 service lines, 3 of which were attached on the north, and 3 on the south side of the pole. How much clearance there was between the adjacent service wires at the point where the "jumper" wire passed through, is in some controversy.

Both the "jumper" and service wires were so insulated that there could be no electric connection between them so long as the insulation remained intact or reasonably so. But, whatever the clearance was originally, the vertical "jumper" subsequently came in contact with the longitudinal service wire next south of it, and, because of the swaying of the latter in the more or less constant but

sometimes none too gentle breezes that play over the Red River valley, there was such a rubbing together of the wires, the vertical with the horizontal, that the insulation was worn through. In consequence, contact between the two sent into the Goar residence over the service wire the 2,300 volt current which so severely injured plaintiff.

Excepting only the item of clearance between the two wires, there is no claim of negligence in the construction of the transformer pole top or the complicated arrangement of wires, insulators and transformers on its numerous cross arms. The one charge of negligence against the company is that it failed to allow sufficient clearance at the point where the disastrous contact afterwards occurred. The same charge is made against the village, and it is averred in addition that it failed in its duty properly to inspect and maintain. Each defendant denies shortcoming on its own part; but is not backward in admitting negligence on the part of the other.

1. The village interposes, as a special defense, a claim that the statutory notice of the injury served upon it by plaintiff was insufficient because "it does not assume or attempt to describe the defects or acts of negligence claimed to have been the cause of the accident." The notice stated that while plaintiff was in her home: "electricity of an enormously and dangerously high voltage  *  *  * entered the said dwelling house along and upon said commercial light service and the wires used therewith," and caused the injuries complained of, and "that said injuries were caused  *  *  * as the natural consequence of  *  *  * some defect in the wiring system and equipment," now in question and by reason of the negligence of the village and its officers or employes "in the care, operation and control of said system  *  *  *"

This notice must be held sufficient. Otherwise, it might be necessary for a plaintiff, injured as was Mrs. Goar, to employ an electrical engineer or other expert to examine an entire municipal system before she could give the notice which is a condition precedent to her right to recovery. Here, the "time, place and circumstances" of the accident were stated with all the particularity the circumstances permitted and all that the statute, G. S. 1913, § 1786, requires. Weber v. City of Minneapolis, 132 Minn. 170, 156 N. W. 287.

2. On the merits, the liability of the village is clear. It is not absolved, even though there was a defect which was due in the first instance to some omission of the company. Whatever such defects might have been, or however numerous, it is the absolute duty of the village to use a degree of care commensurate to the dangers which attend high tension electric currents. Gilbert v. Duluth Gen. Elec. Co. 93 Minn. 99, 100 N. W. 653, 106 Am. St. 430; Musolf v. Duluth Edison Elec. Co. 108 Minn. 369, 122 N. W. 499, 24 L. R. A. (N. S.) 451. It is clear that here that duty was not performed.

The man in charge of its electric distributing plant cannot even climb a pole. For all repairs, intricate in nature or substantial in extent, the versatility and dependable efficiency of the village blacksmith are called into play. In this case, there was no inspection of the transformer pole and its equipment, or any part of the system, from the completion of its work by the company on March 1, 1921, to the day of the accident in August, 1922. There must have come a time when any reasonable attempt at inspection, even an occasional observation of the wires from the ground, would have shown that there was contact, or likely to be contact, between the vertical "jumper" and the horizontal service wire. Confessing failure of such precautions, it is futile for the village to seek to avoid the verdict against it.

3. In fact, the negligence of the village was proven satisfactorily without reference to the rule, res ipsa loquitur, which plaintiff properly invokes. Had plaintiff's proof stopped with the circumstances of the injury, and remained silent concerning the contact between the primary and secondary wires which resulted in the escape of the high tension current into the Goar residence, still there would have been an issue for the jury as against the village, it being in exclusive control at the time being of the instrument of injury. San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 32 Sup. Ct. 399, 56 L. ed. 680; Walsch v. Chas. Frusch Light & Power Co. (Iowa), 193 N. W. 427; Olson v. Great North. Ry. Co. 68 Minn. 155, 71 N. W. 5; Manning v. St. Paul Gaslight Co. 129 Minn. 55, 151 N. W. 423, L. R. A. 1915E, 1022, Ann Cas. 1916E, 276;

Gould v. Winona Gas Co. 100 Minn. 258, 111 N. W. 254, 10 L. R. A. (N. S.) 889.

4. Coming now to the alleged negligence of the company, the solution is not quite so easy. We are convinced, however, that the question of its negligence was also for the jury. The two service lines between which was placed the "jumper" wire were not over 16 inches apart. The company itself does not claim that it placed the "jumper" originally over five inches from the nearest service line. There is evidence that the opinion of some respectable authority is to the effect that: "The normal clearance between conductors should be ordinarily from ten inches to one foot per ten thousand volts between the wires." The company, on the other hand, contends that, inasmuch as a spark from a 2,300 volt wire will only jump one-tenth of an inch, and could not penetrate the insulation even if the conductors were in contact, the original clearance of five inches was sufficient to acquit it of the charge of negligence. Incidentally, the jury by special finding decided that the original clearance was not less than 2 inches, and it is certain that even that much separation, if it had been maintained, would not have permitted electric contact under any circumstances. The trouble is that the rule of commensurate care governing the insulation of high tension electrical equipment requires some consideration of the conditions under which it is to be used. The care required of the contractor must have a forward outlook. He owes a duty to those who are to use the equipment, and it is for him to employ a degree of care proportionate to the hazards to which otherwise they would be subjected.

We are impressed by the argument that it is a question of fact whether it is not negligence to drop a primary wire from a higher to a lower cross arm through or so close to service lines, when, at an expense so small as to be negligible, the "jumper" wires can be carried through conduits attached to the poles. Such construction is so simple and so obviously feasible that we are not inclined to say that the jury went far wrong when they held the company guilty of negligence.

5. It does not follow, however, that the company is liable, even though it was negligent in the manner indicated. That initial negligence was followed by the serious and wrongful inaction of the village. Before the verdict against the company can be sustained, we must resolve against it the question as to whether the negligence of the village was a new agency serving causal connection between the company's negligence and plaintiff's hurt, or whether, on the other hand, such negligence simply concurred with that of the company so as to charge both defendants.

We are not much concerned with the construction contract between the village and the company. True, plaintiff may be considered as within the class of persons for whose benefit the contract was made, but she is not suing, and is not entitled to sue, on that contract. Moreover, there is no claim of any breach of contract. If there was, the village could not here claim any right or immunity as a result.

The case must be decided by rules of negligence. The law of contract has no application. The liability for negligence ordinarily is "independent of any contractual relation." Krahn v. J. L. Owens Co. 125 Minn. 33, 145 N. W. 626, 51 L. R. A. (N. S.) 650. As there stated, "a duty with respect to instrumentalities delivered under contract may exist towards others than the contracting parties." But that duty does not arise from the contract. It arises, rather, from the obligation imposed by law to use due care for the protection of others. There is no difficulty in reaching the conclusion that a contractor, who installs an electric distribution plant for a municipality, owes to its citizens the duty to see that it is *delivered* in a safe condition for their use. The applicable rule is that of commensurate care because the equipment is to handle a very dangerous instrumentality.

It is contended for the company, and it cannot be denied, that, even with a maintained clearance of 2 inches between primary and secondary wires, the structure was a safe one. We are inclined to the belief that the evidence does not warrant a finding that the initial clearance was less than 4 inches, but taking the 2-inch figure adopted by the jury, and the special finding to that effect was the

result of a request made by counsel for the village, if it had remained as the contractor left it, plaintiff would not have been injured.

In such a case, the contractor has a right to rely upon the owner's assuming, immediately upon his acceptance of the work, the duty of inspection and maintenance, which confessedly was not performed here. If it had been, the plaintiff would not have been injured, for the fact that the original clearance was lessening and growing dangerous would have been discovered before the insulation was worn through. It took a year and a half of neglect, and the consequent freedom of the elements to work their will, before any injury resulted.

Not only was the village in exclusive control, and, in consequence, the only agency upon which rested the burden of inspection and maintenance, but the company was deprived, upon its delivery of the plant to the village, of the opportunity and means of protecting the property from deterioration and itself from resulting liability.

While the law of contract does not help us, the presence in the case of the contract is a fact to which proper reference may be made and which may be given its appropriate place with the other facts. One of the facts established by the contract is that the village, by the guaranty clause, assumed the duty, as between the two, of notifying the company of any defect in the plant which it could be required to make good. As between the defendants, then, the company has a much better standing than the village. They could, by contract, adjust their reciprocal duties to suit themselves. The duty so allocated to the village was not performed. As against the company, it has no complaint because, it must be assumed, had the decreasing clearance between the two wires been called to the company's attention, the condition would have been rectified.

How serious and long-continued must such obvious neglect be, in order to become an independent cause of injury? Is there no limit of time beyond which a contractor will cease to be liable, with the owner, for an injury *which could not have happened but for the negligence of the latter?*

If the company is liable in this case, there is no rule of law which would prevent the same result were the accident to occur 10 years later. If, in the one case, the company's negligence be a proximate

cause, it must be so in the other. If in the one situation the negligence of the village be not an independent producing agency of injury, it cannot be in the other. We are dealing with a question of negligence and cannot hold a defendant liable as an insurer. Musolf v. Duluth Edison Elec. Co. 108 Minn. 369, 122 N. W. 499, 24 L. R. A. (N. S.) 451.

Our examination of the problem and the authorities, in the light of which it must be solved, leads us to the conclusion, and we so hold, as a matter of law, that under the circumstances of this case, the negligence of the village was an independent producing agency of such character that it broke the causal connection between the negligence of the company and plaintiff's injury and thereby became the proximate cause of the latter.

In a lucid and most helpful memorandum, the learned trial judge has considered this question. He was of the opinion that it was an open one in this state and proceeds to dispose of it in this manner:

"If negligence of the village had been active, I have no doubt it would have relieved the electric company from liability in this case, but where the negligence of the village was failure to do anything and natural causes brought the wires together causing the accident, I am of opinion the defendants should be held concurrently liable."

We do not reach the same conclusion, because we differ with the view that wrongful omissions are of less effect in law, and attended by less serious consequences, than positive wrongdoing. Action, where legal duty requires no action, is no worse than inaction where legal duty requires action. There is no difference in law or morals between the effects attending the two. Negligence more frequently accompanies omission than commission; but, whatever its cause, its legal consequences are the same.

Here, if, by the affirmative voluntary act of the village, the situation had been rendered dangerous (for example, by the removal of the insulation from the wires), there could be no question that such act would have been the proximate cause. The removal of the insulation and the resulting electric contact are just as clearly attributable to the independent agency of the village, when its *nonaction* is the immediate cause of the damage.

We do not overlook the agency of the elements, the presence of which does not help the village because that very thing imposed the affirmative and important duty to inspect and properly maintain the plant. The wrongful inaction of the village permitted very positive action by wind, rain and thermal changes, the results of which it was for the village to guard against. Therefore, as a passive agent, it became responsible for a positive result, just as much so as though it had been active.

On this phase of the case, it is contended by the company, and there is very persuasive evidence to show, that, by reason of the unequal strain arising from fewer wires on one side than on the other, the pole itself was twisted and the cross arms pulled out of allignment, thereby bringing the jumper wire much closer to the service wire next south of it.

It cannot very well be denied that there was a substantial change of that kind, although the jury might not have thought that it was as great as contended by the company. Certainly there was a substantial increase in the slack of the wires and some change in the position of the cross arms.

The probability that such changes will follow construction and that poles and cross arms tend to adjust themselves to unequal stress, is one of the things that requires, with respect to any distributing plant, especially a new one, proper inspection.

Proceeding now to the authorities (extended citation of which will not be attempted), it is argued that inasmuch as manufacturers of ladders, threshing machines and automobiles have been held liable for defects of fabrication resulting in personal injury to the ultimate user, the constructor of an electrical plant ought not to escape similar liability. The answer is that he does not, and that there is a clear and fundamental distinction which, in the cases mentioned, compelled the attaching of liability, and which, in this case, prevents that result.

The ladder case is Schubert v. J. R. Clark Co. 49 Minn. 331, 51 N. W. 1103, 15 L. R. A. 818, 32 Am. St. 559, and the importance was there recognized of the fact, seemingly thought controlling, that the injury happened "without the intervention of any fault or neglect

on his [plaintiff's] part or on the part of any other person." [49 Minn. 336.]

The threshing machine case is Krahn v. J. E. Owens Co. 125 Minn. 33, 145 N. W. 626, 51 L. R. A. (N. S.) 650, and the board which broke under his weight and let plaintiff's foot into the machinery was, *when it left defendant's hands*, "so defective as to be dangerous to life and limb." [Syllabus.] Moreover, the purchasers (plaintiff was third party) were under no duty to examine the board and the evidence did not compel a finding that they knew of the defect. There was entirely absent the potent intervening negligence we have in this case.

The automobile case is Olds Motor Works v. Shaffer, 145 Ky. 616, 140 S. W. 1037, 37 L. R. A. (N. S.) 560, Ann. Cas. 1913B, 689. The careful reasoning and analysis of authorities which supports its result, negatives a similar one here. It is stated that the two classes of cases where the maker of an article is liable to third persons for negligence of manufacture are these [145 Ky. 620]:

"(1) When he is negligent in the manufacture and sale of an article intrinsically or inherently dangerous * * *

"(2) When the maker sells an article for general use which he knows to be imminently dangerous and unsafe and conceals from the purchaser defects in its construction from which injury might reasonably be expected to happen to those using it."

The opinion then proceeds as follows:

"But in the other class of cases, where the article itself is not inherently or intrinsically dangerous to health or life, a third party seeking to hold the maker liable for injuries suffered by him in the use of the article must show that the maker knew it was unsafe and dangerous, and either concealed the defects or represented that it was safe and sound. But even when this is shown, the maker will not be liable, if it is made to appear that the purchaser had knowledge of the defects at and before the third party was injured in using it."

Another decision especially valuable for its exhaustive consideration of applicable authority, is that in O'Brien v. American Bridge

Co. 110 Minn. 364, 125 N. W. 1012, 32 L. R. A. (N. S.) 980, 136 Am. St. 503.   The bridge there in question collapsed within 5 or 6 weeks after completion.   The negligence of defendant seems to have been so gross as to have been criminal.   The structure was a death trap. It "was not only extremely and imminently baneful, but it was almost inevitably lethal."   *And there was no intervening agency of causation concurrent or proximate, active or passive.*   Had the bridge collapsed years afterwards from the disintegrating effect of the elements, surely the defendant could not have been held liable because some additional precaution of design or construction might have prevented or delayed the fatal deterioration.

In these cases there will be found two elements wholly absent from the instant situation.   The first is the fact that, as the article was delivered to the purchaser and in its *then* condition, it was inherently and *presently* dangerous to those having occasion to use it. The ladder was made of weak and cross grained wood; the footboard on the threshing machine had a similar weakness; the jump seat of the auto was so insecurely attached to the body as to be a trap for the first occupant using it as the machine went over an obstruction or ascended a steep hill.   The bridge was a death trap.   In each case the defect was hidden.

The next element present in the cited cases and absent here, and it is controlling, is that, with respect to the defective instrumentality, there was no agency intervening between manufacturer and user having the affirmative duty of such inspection and maintenance as might be necessary to keep the article in proper condition to insure the safety of the users of it.

There is a clear distinction between the positions of the manufacturer or constructor in the two classes of cases.   In the one, he knows, or must be assumed to know, that the defect exists and that no one else will attempt or will be under any duty to take any steps to discover and remedy it.   In the other, the manufacturer or constructor has a right to rely, and it must be presumed that he does rely, upon his product being kept in safe condition by the one whose duty it is, by inspection and maintenance, to accomplish that result.

We do not go to the extent indicated in the above quotation from Olds Motor Works v. Shaffer, and do not hold that causal connection between the maker's negligence and the ultimate injury to a third party is broken merely because "the purchaser had knowledge of the defects at and before the third party was injured." Krahn v. J. L. Owens Co. 125 Minn. 33, 145 N. W. 626, 51 L. R. A. (N. S.) 650.

But we do hold that, where there has been such a lapse of time as we have here, and there is a duty, clear and affirmative, on the part of the purchaser, to inspect and maintain as against that sure deterioration which is bound to follow from ordinary use, and a complete failure of the performance of that duty, but for which the accident could not have happened, such failure becomes the proximate and not merely a concurring cause.

It is worthy of note that the supreme court of Kansas once solved this problem as counsel for the village and plaintiff have asked us to solve it. Missouri, K. & T. R. Co. v. Merrill, 61 Kan. 671, 60 Pac. 819. Thereafter and with commendable candor the mistake was rectified. Missouri, K. & T. R. Co. v. Merrill, 65 Kan. 436, 70 Pac. 358, 59 L. R. A. 711, 93 Am. St. 287. That was a case where a defective freight car was turned over to a connecting line. The latter was under the duty of inspection to protect its own employes. That duty was not performed. An employe of the connecting line was injured and it was held in the last decision, contrary to the first, that the negligence of the owner of the car was not the proximate cause of the injury, and that there could be recovery only as against the connecting line. The reason of the final decision was put in part upon the fact that "the defective car was not inherently dangerous. It was the manner of its use which caused the injury."

So here, at the time of the delivery of the transformer pole to the village, it was not dangerous inherently or at all. It became so only through the manner of its use and because of the utter neglect by the village of the very important duty which rested upon it.

A similar situation was presented in a Michigan case wherein the defendants were shippers of lumber. The attempt was made to hold them for damages suffered by a freight brakeman who ascribed his injury to the negligent manner in which defendants loaded a car

of lumber. The railway company again was under the duty to inspect for the protection of its employes. It failed to perform that duty and that negligence was held to be the proximate cause and the shippers were held not liable. Fowles v. Briggs, 116 Mich. 425, 74 N. W. 1046, 40 L. R. A. 528, 72 Am. St. 537.

These and similar cases are responsible for the general rule as stated in 22 R. C. L. 118, and 29 Cyc. 502. The former states that "the limitations of the rule," holding the manufacturer of a dangerous article liable for injury to a user, "are that the wrongful act shall be immediately dangerous to the life or property of others, and that there shall be no intervening human agency which might have arrested the injury or furnished protection." In Cyc. it is put this way: "But where after the negligent act a duty devolves on another person in reference to such act or condition which such person fails to perform such failure is the proximate cause of the injury resulting from the act."

We find nothing to except this case from the general rule applicable to independent contractors who have turned over to the owner a completed work designed and built for the latter. In the exceptional cases indicated the builder may remain liable for injuries to third persons, but ordinarily the owner alone is responsible. 14 R. C. L. 107. Howard v. Redden, 93 Conn. 604, 107 Atl. 509, 7 A. L. R. 198, illustrates the rule and O'Brien v. American Bridge Co. 110 Minn. 364, 125 N. W. 1012, 32 L. R. A. (N. S.) 980, 136 Am. St. 503, the exception.

On the appeal of the village there must be an affirmance and on that of the company, a reversal, with instructions to set aside the verdict against it and for judgment in its favor.

So ordered.