E. A. ARNOLD v. NORTHERN STATES POWER COMPANY AND ANOTHER.[1]

March 21, 1941.

Nos. 32,610, 32,627.

[1]Reported in 297 N. W. 182.

*Charles H. Weyl* and *Lystad, Mantor & Day,* for appellant Northern States Power Company.

*Sexton, Mordaunt, Kennedy & Carroll,* for appellant Al Marsolek.

*Freeman & King* and *Edward F. Jacobsen,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendants separately appeal from orders denying their respective alternative motions for judgment or a new trial.

Plaintiff's intestate was killed by coming into contact with a high-tension wire carrying 33,000 volts, the same being part of the electric service system of defendant power company. The place of accident was about half a mile west of St. Cloud adjacent to and south of the paved and much used trunk highway No. 52.

Defendant Marsolek's connection with the accident and the reason for his presence in this case arose in this way: During the early morning, about 5:43 o'clock, on July 31, 1937, while driving his car east toward St. Cloud on this highway, for reasons wholly unexplained by him, the car suddenly left the pavement, plunged to the right, and smashed against a large pole of the power company carrying three highly charged, uninsulated wires. The force of the impact broke off a five-foot portion of the lower part thereof, thereby causing the pole, with its crossarms and wires, to fall toward the north and to extend onto the pavement about 10 or 12 inches, thus encroaching upon the southerly traffic lane of the highway and lowering the wires on the poles to a point two to

four feet above the pavement. The poles, which are over 20 inches in diameter at the base and some 50 feet high, are set about 300 feet apart. Accordingly, when the pole in question was broken it left a span of sagging wire of approximately 600 feet. Marsolek testified: "I collided with this pole, and my mind was rather hazy and I was knocked out. * * *—in fact I haven't any recollection of just what happened." One Trebtoske was seated at Marsolek's right in the front seat. He was "instantly killed," the "right part" of the car having struck the pole.

Witness Mrs. Isaacson, living near-by and hearing "a terrific crash," went to the door and saw "a car just touching the ground. There was just a lot of dust and things, and I immediately went back in the house and called the police" at St. Cloud and "told them to notify the Northern States that the high line was down." Her two boys, 16 and 18 years of age at the time of trial, were awakened, and she instructed them to "go down and see if you can do anything, but keep away from the wires." After putting in the telephone call, she donned a bathrobe and hurried to the scene of the accident. When she got there only a "very few" persons had gathered, and she with the others "were all on the north side of the highway," toward the easterly end of a driveway leading up to the "Morocco Night Club," immediately to the north and adjacent to highway No. 52. There "was no one at all" south of the highway center line. People continued to gather so that when the car in which deceased was riding arrived there were probably "about a dozen or 15 [people] there."

Ebnet, the police officer who took the call, immediately notified the power company and informed Mr. White, foreman of the maintenance department, that someone had broken one of the poles at or near the "Morocco Night Club." This call was put through at 5:45 a. m. Ebnet then drove to the scene. Mr. White telephoned Sorenson, a lineman for the company, and told him to look for the trouble there and to call him back. When Sorenson arrived the wires were hanging down along the south side of the highway. He knew these carried 33,000 volts and were "hot." He brought

no equipment. Observing the condition there and considering it a very dangerous one, he nevertheless left the scene to telephone Mr. White without leaving anyone to stand guard. He also knew that he was the only employe of the company there. Upon his return, after telephoning Mr. White, plaintiff's intestate had been electrocuted.

Trebtoske was thrown out of Marsolek's car. The latter asked one Zenner to notify Father Kroll, a priest living near-by, to come and administer the last rites. This was done, and both Zenner and the priest walked under the wires where they were high to where Trebtoske was lying in the ditch. This was the situation immediately prior to the arrival from the west of Jacob Arnold and his father, plaintiff's intestate.

Jacob was driving his own car, his father sitting to his right. Jacob saw policeman Ebnet, who was standing some 75 feet west of the broken pole. He was directing traffic so as to lead drivers to the north and over the Morocco driveway. Jacob, however, did not understand what the warning was intended to accomplish, so he drove his car a little farther to the east and then onto the Morocco driveway. In so doing he passed the broken pole, saw the Marsolek automobile in the ditch, and that someone was badly hurt. Both Jacob and his father hurriedly got out, Jacob on the left, his father on the right, side of the car. After Jacob had got out on the north side, he observed his father walking hurriedly across the pavement to the south, saying, "Well, let's go over there and help," referring to the car in the ditch and to Marsolek, who appeared to be severely hurt, bleeding at the mouth and apparently dazed. While attempting to go under the wires decedent came in contact with one of them with the result stated. The morning was bright and clear, the pavement and shoulders dry, and visibility good.

The company has equipment to handle live wires, among which is one known as a "hot stick." With such an appliance a wire may be lifted out of danger. It also has flags and danger signs. Another appliance and a part of the company's regular equipment

is known as a "ground chain." When one of these is thrown over a wire and allowed to touch the ground the high-power wire becomes dead and harmless.

Some five minutes before plaintiff's intestate appeared upon the scene a power company truck arrived, headed west. Apparently this truck was carrying equipment suitable for use on an occasion such as this. The two men riding in it got out a minute or two, then left without doing anything and left no one there representing the company to warn drivers or pedestrians.

Plaintiff sought and obtained recovery against both defendants on the theory that (1) Marsolek's admitted negligence set in motion the lethal cause, and (2) the company's failure to take appropriate precautions to warn the public, especially the decedent, of the very dangerous high voltage wires, and its failure to turn off the current after having notice of a dangerous situation constituted a concurrent cause.

Both defendants are in harmony in claiming that decedent was guilty of contributory negligence as a matter of law, hence that we should order judgment for both of them. But if this contention is not sustained we find each pointing to the other as being the sole cause of Arnold's death. Marsolek asserts that the breaking of the pole "was not the proximate cause" of Arnold's death since "any negligence" on his part "was insulated by the negligence" of the power company. To this the power company replies:

"It is conceded that Marsolek was negligent in driving into the pole and therefore it is conceded that Marsolek created a negligent condition," and that "the sequence of events put in motion by Marsolek was not interrupted by this defendant before the accident to Arnold."

In its own behalf the company points out that only 14 minutes elapsed between the time the pole was struck and the time of Arnold's death; that upon learning that there was trouble with its power system it took prompt steps to ascertain the source; and that, having learned where and what the trouble was, it acted

with such reasonable dispatch and efficiency as to leave open no jury question.

Marsolek's negligence is obvious and conceded. In view thereof, the court instructed the jury that if they should find that decedent was not guilty of contributory negligence Marsolek was liable as a matter of law. It refused to submit the question of whether the subsequent inaction of the power company was an intervening cause. Assuming that the court was right, we then must consider and determine the most difficult question in the case, whether decedent was guilty of contributory negligence as a matter of law. On this phase the court instructed the jury that, this accident having happened upon a public highway, Arnold was not to be treated as a trespasser since he had a right to be there, but that he was nevertheless "under the duty of using due care to avoid being injured * * * through any instrumentality that the exercise of due care would warn him of." Continuing, the court said: "It is the duty of Mr. Arnold at the time and place in question to use such ordinary care for his own safety as a person of reasonable prudence would exercise under the same or a like situation, and it was his duty to use such care in proportion to the dangers reasonably to be apprehended." At this point the court gave the eminent peril rule in this fashion:

If the jury should find that decedent was "bent upon aiding" injured persons by the roadside "with an intent to aid others in distress" and thereby incurred risks "in an attempt to save human life, which act on his part might otherwise be regarded as negligence," this would not necessarily charge him "with negligence as a matter of law." In determining that issue the jury should "take into consideration all of the facts and circumstances as they existed at that time, and the knowledge which the deceased" then had "of those facts * * * If he exercised such ordinary care as * * * a reasonably prudent person under all the facts and circumstances then and there existing would have exercised, then he performed his whole duty in that respect, and he could not be charged with contributory negligence."

This is the only portion of the court's charge assigned as error by the company. Aside from the eminent peril rule as given, it makes no complaint respecting the instructions.

■ The doctrine as recognized and applied by this court is that summarized in Perpich v. Leetonia Mining Co. 118 Minn. 508, 512, 137 N. W. 12, 14:

When one, because of negligence of another, is placed in imminent peril of life, a third person may seek to rescue such imperiled person and may recover for injuries received by him in the attempt in an action against the one whose negligence imperiled the life of such person in danger, unless "it appear that the attempt to rescue was clearly one of rashness or recklessness under the circumstances presented. * * *

"Upon that question the law is neither harsh nor exacting. * * * Sentiments of humanity applaud the act, the law commends it, and, if not extremely rash and reckless, awards the rescuer redress for injuries received, without weighing with technical precision the rules of contributory negligence or assumption of risk." See 20 R. C. L. p. 29, § 22, and cases cited.

Some additional facts should now be stated. Arnold was a farmer who had no electric appliances or electric service on his place. His actions upon the occasion in question are persuasive that he was ignorant of the hidden dangers lurking in electrically charged wires. When he came upon the scene a number of people were there, all of them on or near the northerly side of the road. No one was on the southerly half of it—the only place where there was real danger. To him the situation was plainly one calling for action. So the inference drawn by one of the witnesses at the scene, that "he was not going to just stand by and look at things," seems a reasonable one. That is why decedent said as he started across the pavement, "Isn't somebody going to help these people?" As soon as he got out of his car he went "on a trot" directly toward Marsolek, who appeared to be in genuine distress—in immediate need of help. So it is apparent, or at least the jury

could so find, that Arnold was "bent" on an errand of mercy. His response was nothing more than the commendable human instinct of rendering aid to those in need. If this had been a burning building negligently set afire by defendants, as near to the highway as was the smashed car, and there were people in imminent danger of being seriously, perhaps fatally, hurt, would defendants, or either of them, say that one in Arnold's position was, under the circumstances, so negligent that, as a matter of law, he forfeited all right of legal redress?

Between Arnold and Marsolek's wrecked car there was nothing intervening except some wires overhanging the edge of the highway. To a farmer, ignorant of any lurking danger, these wires were no more to be feared than a wire fence. "To men not acquainted with power lines the outer bare wires might have been taken as not dangerous because not insulated as were the harmless inside ones." Neumann v. Interstate Power Co. 179 Minn. 46, 52, 228 N. W. 342, 344. Other people had gone under these wires although not at that particular point. Only a moment before Arnold was electrocuted one Lee Lambkin went under or near these wires, and Mrs. Isaacson shouted: "Lee, look out for the wires." She had no "more than gotten the words out of her mouth" when she saw Arnold go under them and saw him fall with flashing electric sparks apparently going through his body and striking the cement underneath.

It is not contributory negligence as a matter of law "for a plaintiff to expose himself to danger in a reasonable effort to save a third person * * * from harm." Restatement, Torts, § 472. The same thought was expressed in Wolfinger v. Shaw, 138 Neb. 229, 236, 292 N. W. 731, 735:

"In order to relieve a person from a charge of contributory negligence as a matter of law in attempting to save persons or property from harm, it is sufficient, if to a reasonably prudent person, the existing circumstances create the apprehension of danger even though danger to a definite person or a definite property was not actually imminent at the moment."

■ To traffic upon this highway, especially that eastbound, the broken pole with its highly charged wires constituted a real traffic hazard. Events immediately following Marsolek's accident created what the jury could well find was an emergency. The facts clearly disclose that those in the vicinity so considered it. There was much confusion, largely, if not entirely, due to the inaptness and ignorance of the bystanders effectively to do what should have been done to keep people from getting hurt. There was lack of speedy and efficient action on the part of the company. As the owner of a dangerous instrumentality, its employes knew that there was immediate need to supervise and direct traffic, or immediately to deaden the high current flow of electricity, or to lift the wires out of the danger zone. While an emergency is not the subject of easy or exact definition, nevertheless courts have formulated one, as in Wolfinger v. Shaw, 138 Neb. 229, 236, 292 N. W. 731, 735, where it was said that it was "any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency; * * * an unforeseen occurrence or condition." The definition fits the fact situation here presented. Accordingly, we hold that the failure of the power company, after notice, to take more efficient and prompt means than it did to meet the emergency presented and to safeguard the public was a cause contributing to the death of plaintiff's intestate.

■ Nor do we think the naked fact that the power company "did not create" the dangerous situation relieves it of responsibility. True, its liability cannot be predicated upon any initial wrong or lack of care. Its liability attaches, if at all, only because it failed to act when action on its part became an immediate necessity. Inaction where duty requires action is just as potent a factor in the chain of causation as action "where legal duty requires no action, * * * There is no difference in law or morals between the effects attending the two." Goar v. Village of Stephen, 157 Minn. 228, 237, 196 N. W. 171, 174; Taylor v. Northern States Power Co. 196 Minn. 22, 27, 264 N. W. 139. Its failure to act promptly is what made its liability a jury question.

■ Marsolek's claim that failure of the company so to act "insulated" his wrongdoing is, we think, wholly without foundation. He does not question his own negligence in setting in motion the cause ending in Arnold's death. Nor is there any doubt that the continuous sequence of events so put in motion was in no way interrupted. In this respect the facts here are wholly unlike Childs v. Standard Oil Co. 149 Minn. 166, 182 N. W. 1000, and Goar v. Village of Stephen, *supra*. In both of those cases and the other cases cited by Marsolek, the original situation and the resulting cause were so changed by the subsequent negligence of the intervening third party that the latter's negligence "insulated" the first wrong; or, as held in the Goar case, the subsequent and long-continued inaction of the village caused a change which proved to be the direct and harmful agency causing harm. Ferraro v. Taylor, 197 Minn. 5, 265 N. W. 829, illustrates the rule here applicable. In that case the claimed break in the chain of causation was a more potent factor to "insulate" the initial wrongdoer than is Marsolek's in this case. There Taylor's willful conduct in continuing to operate an obviously defective car was held not to insulate the initial wrongdoer, the car owner, who had provided him with the faulty instrumentality for the use to which Taylor put it.

The problem of causal relation is one of fact. We have here no intervening act, intentional or otherwise. Nor can it be said, certainly not as a matter of law, that such delay had elapsed between Marsolek's original wrong and the company's failure to act that the holding in the Goar case can be of aid to him.

The court was clearly right in holding that there was no question of intervening cause to go to the jury. Arnold's contributory negligence, duly submitted as a fact issue, was Marsolek's only defense. The verdict on that score is well founded.

In Butler v. Northwestern Hospital, 202 Minn. 282, 288, 278 N. W. 37, 40, we said:

" 'An intervening force is one which comes into active operation in producing the result, *after* the defendant's negligence. "Inter-

vening" is used in a time sense; it refers to later events. Conditions existing and forces already in operation at the time of defendant's conduct are not included within the term.'"

The problems heretofore discussed relate only to the claimed right of either or both defendants to judgment notwithstanding. We are now required to consider errors claimed to be of such gravity as to require a new trial.

■ While Jacob Arnold was testifying he related what his father said immediately before attempting to cross the highway to go to the aid of Marsolek. There was a motion to strike, then denied upon plaintiff's claim that it was part of the *res gestae*. Later, plaintiff's counsel deeming the recital inadmissible under the statute, since Jacob was beneficially interested in any recovery that might be had due to his father's death, acknowledged error, and the court instructed the jury wholly to disregard it. In these circumstances we cannot say that there was reversible error. In that connection we may mention that another witness, Wilbur Daniel, having no interest in the case, testified that decedent exclaimed, "Isn't somebody going to help these people?" Thus the likelihood of harm caused by Jacob's testimony, in view of Daniel's, vanishes into thin air.

What has been said also disposes of the assignment that plaintiff's counsel was guilty of misconduct in bringing into the case Jacob's testimony.

■ Next to be considered is the claimed error in permitting Mr. Daniel to testify to the quoted statement or exclamation made by decedent. The assertion is that this was not a part of the *res gestae* but pure hearsay. Clark v. Davis, 153 Minn. 143, 146, 147, 190 N. W. 45, 46, and Schendel v. C. M. & St. P. Ry. Co. 158 Minn. 378, 197 N. W. 744, are cited and relied upon for reversal. In the Davis case the court held that to permit a statement by an injured person made to his sister and mother after coming from under the influence of ether as to the manner in which he was hurt was admissible since there were present "startling occurrences calculated to produce nervous excitement and spontaneous

utterances." The utterances there made were considered to have sprung "out of the transaction," were "spontaneous," and were "generated by an excited feeling" extending "without break or let-down from the moment of the event to the moment of the utterance, and under such circumstances as to reasonably preclude the idea of calculation of deliberate design. What the law distrusts is 'not after-speech but after-thought.' " In the Schendel case it was held error "to admit as *res gestae* a statement made by the foreman of a switching crew to the coroner concerning the accident, which had happened some 15 to 20 minutes previously, wherein a member of the crew was killed." That statement was not considered to be "a spontaneous expression springing involuntarily from the event, but a mere recital thereof after time and opportunity for reflection and design."

Helpful on this phase is Mitton v. Cargill Elev. Co. 129 Minn. 449, 451, 152 N. W. 753. The principle is well settled, but its application is often difficult. The fact remains, however, that (Clark v. Davis, 153 Minn. 143, 146, 190 N. W. 45, 46) "there is a large element of discretion in the trial court" in admitting or excluding such statements.

We think the court correctly exercised its discretion in the circumstances related.

Orders affirmed.