# EARL MARTIN AND ANOTHER v. NORTHERN STATES POWER COMPANY.[1]

November 4, 1955.

No. 36,601.

*Durham, Swanson & Lasley,* for appellant.
*Robb, Robb & Van Eps,* for respondents.

[1]Reported in 72 N. W. (2d) 867.

NELSON, JUSTICE.

Suit was commenced to recover damages to home and contents caused by fire due to overheating of electrical wire and equipment. Plaintiffs, husband and wife, were the owners of a lot in joint tenancy upon which there was a partially constructed house. It was located at 8356 Wentworth Avenue in the city of Minneapolis. The plaintiff Earl Martin, who was a carpenter, installed an electrical system leading into the basement of the house, and this was done with the help of his brother-in-law, an electrician. They set up a pole consisting of a 4 x 6 timber about 11-12 feet in length approximately 8 to 10 inches from the foundation wall on the west side of the house and about 2½ feet from the door leading into the basement. They attached a meter connection box to the pole. Thereafter the Northern States Power Company, the defendant herein, installed its meter and lead-in wires from one of its poles in the alley, and when the job was completed, sealed the box as is its custom. The defendant company attached its lead-in wires to two meter sockets fastened on the pole. From these meter sockets wires lead to the inside of plaintiffs' basement apartment. The wires from the pole in the alley to the top of this temporary pole were strung by the defendant. From there on, all the installation was done by the plaintiff Earl Martin with the assistance of his brother-in-law, who was the electrician. The meter sockets were owned and furnished by the defendant, but it had no part in fastening them to the temporary pole or connecting them with the lead-in wires and the wires running out of the socket into the basement. The larger of the two meters was for heating and power and the other one was for lighting purposes. We will only be concerned here with the smaller of the two meters, which was located below the larger one.

This installation had been working properly for about two years prior to the evening of June 23, 1952, when around 6 p. m. there was a severe electrical windstorm which interrupted the electric current and caused the power to go off in the entire block. During the full period which the plaintiffs had lived in their basement apartment, no criticism whatever had been directed at plaintiffs' installation.

The entire installation had been done properly, and the defendant offered no testimony in contradiction. The power was in fact cut off from some 2,000 other homes in the area by the storm. The plaintiffs did not personally call the defendant to notify them of the interruption of the current for the reason that they had talked to their neighbors after the storm and were told that they had already notified the company and that the company had notice.

Earl Martin found the pole with the meter installation leaning over at a 45-degree angle away from the house shortly after the storm. A wire was holding it up, and the wires at the top of the pole were obviously slacker than they had been. He put a prop under it so that it would not fall on the children but otherwise did nothing further about it. He said he saw nothing wrong with the meters or the pole, except the leaning of it caused by the storm. Martin's wife, June, together with a neighbor Phyllis Dyck and a Mr. Ambrose Klotz, a master electrician who repaired the electrical work at the house a week later, corroborated the testimony regarding the leaning of the pole.

The next morning, after Earl Martin had left for his work, the defendant's crew arrived in the area to restore the electrical current. Almost immediately after they re-fused the transformer, fire broke out in the Martin house. Mrs. Martin noticed the smoke and shortly thereafter went into the basement where she saw red-hot wires by the water heater and the fuse box. There is no dispute but that the fire was started by the overheating of the electrical system in the basement of the Martin house.

Defendant's employee, Louis Thompson, with his assistant, had parked his truck in the driveway at 8346 Wentworth Avenue. They looked over the various lead-in wires in the block to see if there was any noticeable damage done but did not go to the Martin house to make a close-up inspection. It was all done by standing in the alley near the truck and looking around the area from that point; that constituted their inspection prior to their re-energizing the line, which energized the lead-in wires running into the Martin house.

Shortly thereafter someone called Thompson's attention to the fact that smoke was coming out of the Martin basement. He then went over and, according to his testimony, placed his ladder against the temporary pole and climbed up it and cut off the lead-in wires. There is some dispute as to whether it was necessary to use a ladder in order to reach the wires because of the leaning of the pole. Thompson and his helper denied that the pole was leaning at a 45-degree angle but admitted that it might have been leaning slightly.

Due to some confusion as to which village fire department had jurisdiction, there was some delay in the arrival of the fire department, so that the fire was not put out as soon as it might have been. Several days after the fire Mr. Ambrose Klotz was engaged to restore the electrical installation. When taking off the meter, he discovered that one of the porcelain terminal blocks was broken, causing a short, so that when the transformer was re-fused, the live wires became crossed with a ground wire leading into the house, thus causing the ground wire to heat up to such an extent that it started the fire resulting in the damage complained of. Plaintiffs' electrical expert, John H. Williams, stated that, when the temporary pole was blown or pulled away from the house, it caused such a strain on the wires running from the meter socket to the house that it resulted in the breaking of the porcelain terminal block, which in turn caused the crossing of the live and ground wires resulting in the transformer fuse blowing out. He stated that from an electrical standpoint, if the fuse had not blown out at the time it did, the fire would have occurred then and not when the transformer was re-fused the next morning.

This damage admittedly could not be seen from the outside. Since the meter assembly had been sealed by the defendant company, the plaintiffs could not inspect the interior of defendant's meter assembly without breaking defendant's seal, thus violating its rules and regulations. The meter was held in the socket by means of friction between the posts and it is held to the socket by a band and a seal affixed by defendant, which seal must not be broken except by an electrician. In addition to the broken porcelain block and the fusing

"short" defendant's distribution superintendent found that the terminal legs for the plug-in lugs were bent, which establishes mechanical force of the breaking pole and the consequent strain through "storm damage" which caused the initial interruption of the service. That the defendant owned the installations commencing at the housing of the meter socket and extending from that point through the porcelain base and the terminals affixed thereto through the lead-ins to the line to the transformer, and thereon to the source of power is not disputed. All of this material was part of the defendant's own system and under its exclusive control. It attached its seal to prevent interference by others than its own men. The break and the short occurred in that portion of the electrical installation.

Plaintiffs assert that defendant was negligent in failing to properly investigate and inspect its own lines and connections before re-energizing its lines on the morning following the storm; that it was negligent in re-energizing its lines without first ascertaining the cause of the interruption of the service and the true condition of its own line, meter sockets, meters, equipment, and connections. Resolving all conflicts in the testimony in favor of the prevailing parties below, it appears that their transformer fuse had been cut out caused by a short; that shorts are frequently caused by storms. Storm damage, including broken poles, is a common cause of shorts and one to be investigated as a primary step in restoration of service. It is not disputed that the customers' meter poles are within the scope of the defendant's investigation. The plaintiffs' pole was blown over at a 45-degree angle, this pole carrying lines to the affected transformer. The meters and meter sockets were on the affected pole and plaintiffs' lead-in was attached to fragile porcelain which lead-in was subject to strain and such strain was a cause in the breaking of defendant's porcelain resulting in a fusing short and a bending of the terminal legs, the plug-in lugs being bent. The interior of the meter socket was readily open to inspection by the defendant, its agents and employees, they being permitted to break the seal. Full inspection was possible by the simple means of lifting the meter from the socket. The bent condition of plaintiffs' pole was open to

view without obstructions and could be observed by defendant's agents and employees and was so observed before re-energizing.

One Carl Strand, the defendant's electrical distribution superintendent, testified that, when a crew is sent out after a storm, one of their duties is to make observations to see what storm damage might have affected the lines, such as fallen branches, broken wires, and broken poles; that the first thing they look for is something that cuts out lines; that their crews are instructed to see whether or not storm damage explains a cut off, if there is one; that if there is anything where wires are attached which shows storm damage, they are expected to look; that they have a lot of trouble with lead-in wires to homes; that, if a storm has blown down a pole carrying a line, the men are expected to look to see if there is any damage, and that includes poles furnished by a customer; that when crews go out they are expected to look for shorts and for storm damage; that blown-down trees and poles are common causes of shorts.

Plaintiffs contend that the defendant's repairmen failed to make a proper inspection, that their observation was faulty since the pole was only approximately 100 feet away; that they, the plaintiffs, were entitled to have proper attention given to obvious storm damage by careful inspection and not merely a cursory survey from the distance it was made; that the facts as enumerated by the testimony throughout establish the failure of the defendant to exercise the care incumbent upon a purveyor of electricity in undertaking to restore service known to have been interrupted by a violent and unusual storm.

The jury found for the plaintiffs and assessed damages in the amount of $6,000. The defendant moved for judgment notwithstanding the verdict or a new trial, which was denied. Defendant appeals from the order. The amount of the verdict, however, is not questioned on this appeal. The defendant assigns error upon the following grounds: First, that the trial court erred in denying defendant's motion for a directed verdict at the close of all the testimony; second, that the trial court erred in denying defendant's motion for judgment notwithstanding the verdict or a new trial.

■ The rule applicable to a purveyor of electricity is that a high degree of care is required of those who undertake to generate and transmit that commodity, but the liability is nevertheless grounded upon negligence and is not the liability of an insurer. The legal issues involved here are: Was the defendant guilty of any negligence which proximately contributed to the fire and resultant damage; were the plaintiffs and each of them guilty of contributory negligence which would bar any recovery on their part.

The defendant has cited the following cases as controlling upon the present facts and entitling it to prevail on this appeal: Oesterreich v. Claas, 237 Wis. 343, 295 N. W. 766, 134 A. L. R. 499; Bellefuil v. Willmar Gas Co. Inc. 243 Minn. 123, 66 N. W. (2d) 779; Anderson v. Northern States Power Co. 236 Minn. 196, 52 N. W. (2d) 434. The defendant's argument on the issue of negligence seems to be based on the rule that a utility is not liable for accidents due to defects in lines which it does not own or control unless it energizes those lines with knowledge of a defect in them. The foregoing Oesterreich, Bellefuil, and Anderson cases cited by the defendant stand for this rule and it is a correct statement of the law, but it does not fit the facts of this case because the defendant here did own the lead-in wires and the meter and controlled their installation and operation in the meter connection box. The meters and meter sockets and the wires running from that point to the transformer were property of the defendant, and only the wires running from the socket into the basement were the plaintiffs' property. Therefore the line of demarcation between plaintiffs' installation and defendant's system was at the terminal in the socket nearest the house and the break and fuse short were on defendant's side of the boundary. No one would contend that under the circumstances the utility company was not required to carefully inspect its lead-in wires and their connections before re-energizing its line following a fuse blow-out due to a severe storm.

The court below submitted the question of defendant's negligence and the question of plaintiffs' contributory negligence to the jury for its determination, and properly so. If the plaintiffs' pole housing the meter boxes and connections bearing defendant's seal was

leaning at a 45-degree angle and held up by the lead-in wires, as the evidence for the plaintiffs tends to show, and the jury so found, it was then negligence for the defendant to re-energize its lines without checking the connections in the meter connection box for the reason that the leaning of the pole on the wires was a warning to the trouble crew sent out by the defendant of the possible existence of damage to the connections in the meter box outside the plaintiffs' house. In view of the conflict in the evidence, it was for the jury to say to what extent the pole was leaning away from the house after the storm and whether the defendant's failure to more fully and more carefully inspect the connections before re-energizing the line was a negligent omission on the part of its agents.

The testimony is clear that bad or severe storms are a common cause of shorts in circuits and something which trouble crews sent out to make repairs are expected to look for. In doing so they must exercise the degree of care applicable to the purveyor of electricity. The measure of that duty is the exercise of a high degree of diligence. It may be said here that the defendant concedes that the plaintiffs' damage flowed approximately from the later re-energizing of the line.

■ The rule applicable to the situation was enunciated by this court in Gilbert v. Duluth General Elec. Co. 93 Minn. 99, 105, 100 N. W. 653, 655, wherein the court said:

"* * * 'Electric companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus. This care varies with the danger which would be incurred by negligence. In cases where the wires carry strong and dangerous currents of electricity, and the result of negligence might be exposure to death or serious accident, the highest degree of care is required.' * * * Under such circumstances reasonable care requires the exercise of a high degree of diligence."

In Hayden v. Carey, 182 Wis. 530, 196 N. W. 218, plaintiff suffered personal injuries as the result of contact with a live electric wire following a violent storm. There was no claim that the purveyor of the electrical current had notice of the particular damage which

resulted in the injuries. As to duty and breach thereof, we quote from the Wisconsin court as follows (182 Wis. 537, 196 N. W. 220) :

"Where wires become disarranged as the result of an unusual storm it is the duty of the owner of an electric light plant to make immediate repairs, and after a storm of any considerable vigor, although it is not of extraordinary violence, an owner is bound to anticipate that its system may be out of order, and it is incumbent upon him to make an immediate inspection thereof as soon as practicable."

A somewhat recent Michigan case, Okemos Elev. Co. v. Consumers Power Co. 323 Mich. 229, 35 N. W. (2d) 157, presents somewhat similar facts to those of the instant case. A violent storm had taken place. There was a crossing of wires sending a current into plaintiff's premises in a manner comparable to the situation here, and the premises were set on fire. The purveyor of electric current had notice of the trouble but pleaded the great burden of repair work imposed upon it because the damage done in the area was extensive.

The only difference between the instant case and the Okemos Elev. Co. case is that, there, the negligence was negative in that the purveyor failed to cut off the current, whereas in the instant case the negligence was active and affirmative in that purveyor turned on a current in the presence of defects or damage which by the exercise of the required diligence would have been discovered. The jury found for the plaintiff elevator, the Michigan court commenting that the testimony indicated that after the defendant power company had knowledge of the dangerous condition it was fairly and reasonably within the power of the defendant, if it had used its available crews as speedily as reasonably possible, to have seasonably cut the wire in question and thus have prevented the fire at the elevator. It held that this was a jury question and it therefore concluded that the jury found that defendant was negligent in not seasonably cutting the wire in question.

In the instant case the damage followed an affirmative act of the defendant in re-energizing the line without finding a discoverable

short, one of the common causes of interruption to be found and eliminated following storms.

The cases cited by defendant as controlling deal with the converse of the facts of the case before us here. They are not applicable since they deal with situations where the transmission line is neither built, owned, nor controlled by the power company, and the injury occurred on private lines constructed, owned, and controlled by the consumers, the casualty occurring on the consumers' side of the boundary. Those cases, however, it should be noted, charge a duty to the purveyor of electricity even for defects in private lines where the purveyor is chargeable with knowledge of dangerous conditions in the private line or appliances connected therewith. The Bellefuil case is not in point here since on its facts it involved, as did all the rest of defendant's cited decisions, a defect in the consumer's installations.

■ In the case of Goar v. Village of Stephen, 157 Minn. 228, 196 N. W. 171, a householder was injured as a result of a short occurring outside of the building brought about by the action of the elements. In that case the village who was the distributor and purveyor of the electricity stands in the same position to Goar as Northern States Power Company stands to the plaintiffs in the case at bar. Speaking of the defects which resulted in the short, this court said (157 Minn. 233, 196 N. W. 173) :

"* * * Whatever such defects might have been, or however numerous, it is the absolute duty of the village [purveyors] to use a degree of care commensurate to the dangers * * *."

A little further on in the decision, this court said:

"* * * In this case, there was no inspection of the transformer pole and its equipment, * * *. There must have come a time when any reasonable attempt at inspection, even an occasional observation of the wires from the ground, would have shown that there was contact, or likely to be contact, between the vertical 'jumper' and the horizontal service wire. Confessing failure of such precautions, it is futile for the village to seek to avoid the verdict against it."

464

■ The questions of negligence and of contributory negligence, when a survey of all the facts is made, narrows down to the question of whether under the circumstances as they existed on the morning after the storm, the defendant was negligent in energizing without making a more comprehensive survey as to shorts. The jury said that the defendant was negligent and that it was negligent without contribution by the plaintiffs. The situation was simply that the defendant owned and controlled an electric generating system, transmitting electric current through a system of wires and transformers to a meter and meter socket installed upon a post, the post furnished by the plaintiff on plaintiffs' premises. With the exception of the post and the wires that lead from the socket to the basement, this entire system was the property of the defendant and under its control. The duty to inspect, maintain, and make necessary repairs, under such circumstances, rests upon the defendant. Goar v. Village of Stephen, *supra;* Hayden v. Carey, *supra.*

The charge of contributory negligence made against the plaintiffs must be directed to a consideration of plaintiffs' duty with respect to discovery and repair of defendant's property and the duty of the plaintiffs to manipulate the company's devices to control, de-energize, or re-energize its conductors of current. We believe that the plaintiffs properly left the handling of the company's wires, sockets, transformers, and the like to the company's men, who were experts, and properly relied on them to perform the duty imposed upon them by law to correct the cause of the failure, whatever it was. No one who fails to qualify as a trained worker in electricity and does not have an electrician's authority to break the seal on a meter box would be expected to have detected the short by any inspection he might have made or to have undertaken the necessary repairs. In fact, he might well be contributorily negligent in case of accident in view of the little knowledge that the average man possesses as to the operation of electricity and the conducting of a business so often fraught with danger. This court has heretofore disapproved of interference by ultimate consumers in electric companies' installations. Beery v. Northern States Power Co. 239 Minn. 48, 57 N. W. (2d)

838; Greenwald v. Northern States Power Co. 226 Minn. 216, 32 N. W. (2d) 320.

The record here shows affirmatively that the plaintiff had little or no knowledge of electricity and had no experience with electrical appliances or wires except as he had worked with a brother-in-law, an electrician, in setting up the pole at the home of the plaintiffs and installing the wires that led into the basement. He could hardly have been aware of the condition existing in the meter box or how the short had come about. See, Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 10 N. W. (2d) 398. Having learned that the neighbors had notified the company of the failure or cut-off of all electric current in the block following the storm, he went to work the next morning without making any investigation or trying in any manner to correct the situation, knowing full well that only those who were expert in maintenance and in making such electrical repairs must do the job and that the defendant company was entitled to have it done by their own experts, upon their own property, wires, and equipment. We have no difficulty in coming to the conclusion that the questions of defendant's negligence and plaintiffs' contributory negligence were for the jury's determination.

Affirmed.

Mr. Justice Frank T. Gallagher took no part in the consideration or decision of this case.