(No. 6816.    March 24, 1941.)

IRVING MAXON CHASE, as administrator with the Will annexed of the Estate of Ella G. Libby, deceased, Plaintiff, and PHOENIX FIRE INSURANCE COMPANY, a corporation, Intervenor, Respondents, v. THE WASHINGTON WATER POWER COMPANY, a corporation, Appellant.

[111 Pac. (2d) 872.]

W. F. McNaughton, for Appellant.

Whitla & Knudson, for Respondent Chase.

Edward H. Berg and Ray A. Redfield, for Intervenor.

KOELSCH, D. J.—The plaintiff, Irving Maxon Chase, as administrator, hereafter called respondent, is the owner of the northeast quarter of Section Thirty-three, Township Fifty-one North, Range Five West, in Kootenai County, this state. His neighbor, Peter L. Beck, owns the southeast quarter of the same section. These lands are enclosed by three strand, barbed wire fences, and a similar fence divides the two quarter sections, this division fence being attached to a common post at the quarter section corner, in the north and south fence along the eastern boundary of this section. The latter fence also marks the western boundary of the public highway running north and south past these two quarter sections. Also, along this western boundary of the highway, and along the last referred to fence, the appellant The Washington Water Power Company has constructed and maintains, a power line for the carrying and distribution of electricity to its patrons. This power line consists of poles, approximately 35 feet in height, with two cross-arms near the top of each pole, a short one probably two feet from such top, and a longer one about two feet below that. The short arm has one insulator to which is attached a high-tension wire carrying about 60,000 volts of electricity, while the longer cross-arm has two insulators, to which are attached similar transmission wires. The particular pole involved in this action, situated about 150 or 200 feet south of the common fence corner post, has attached to its top a guy wire running down to and anchored in the ground approximately fifteen feet north from the base of the pole. This guy wire is uninsulated,

and has attached to it a flash board reaching from the ground up probably five or six feet. Both fence and power line had been erected a number of years prior to the event which is the subject of this lawsuit. And the evidence shows that at the time of the event referred to and for probably two years before that, the barbed wire fence near this particular pole leaned so far out of its line that its three strands of wire touched and rubbed against the uninsulated guy wire.

On August 25, 1939, there was a sudden flash or "explosion" of electricity, at or near the top of the pole hereinbefore described, and almost instantaneously numerous fires were observed in the dry grass, all along the barbed wire fences, and also at the respondent's barn, to which the division fence was attached. That the fires were started by a current of electricity along the barbed wire fences, is beyond doubt. The problem is, How was the electricity conducted or communicated to the wires in the fences? In the investigation made within an hour or two to determine this question, two dead chicken hawks were discovered at or near the foot of the power pole heretofore described. These hawks had their talons interlocked, and both were badly singed by fire. At once the theory was advanced, and apparently accepted by all parties to this action, that these chicken hawks, while engaged in an aerial battle in the course of which they had interlocked their talons, and while so attached to each other, had fallen or flown so that one of them touched the high-tension transmission line at the same instant that the other touched the guy wire, which wires were spaced twenty-eight inches apart, the bodies of these birds thus forming a connecting link through which the current of electricity escaped from the transmission line to the guy wire and along the latter to the barbed wire fence, which, as stated, leaned against and articulated with the uninsulated guy wire.

The barn, and certain personal property, having been totally destroyed, and some other buildings injured by the fire, the respondent brought this action to recover the damages by him sustained. The jury rendered a verdict in his favor for the sum of $1,000.00, and in favor of the

intervenor, which had paid respondent under an insurance policy on some of the buildings injured, for the sum of $529.00, and from a judgment entered in pursuance of such verdict, the defendant Power Co. has appealed to this Court.

The ground upon which the appellant bases its request for a reversal of the judgment is that the evidence fails to show that the injuries complained of were due to any negligence on its part.

It is first pointed out that there was no negligence in the construction of the power line at the pole from whence the electricity escaped; that the space between the transmission wire and the guy wire was 28 inches, and that that spacing was in accordance with standard construction and deemed safe by public untility commissions and generally by those familiar with, or engaged in the construction or maintenance of electric power lines.

It is next contended that standard construction does not require that guy wires be insulated, and that it is not practicable to effectively insulate guy wires in power lines carrying so high a voltage as was transmitted over these lines; and, it is urged that the standard or generally accepted precaution against the escape of electricity from the transmission wire to the guy wire is the spacing of such wires of not less than 27 inches apart.

Appellant next points out that while it must be admitted that the electricity which wrought the destruction of respondent's property, came from appellant's transmission wire, appellant contends that the event which caused such electricity to span the space between the transmission wire and guy wire, was so unusual and so unforeseeable that appellant is in no wise responsible for the same; and, hence, its negligence in allowing contact between the guy wire and the fence, which is the only negligence charged or chargeable against it, was not a proximate cause of the fire which destroyed respondent's property.

It is admitted that the highest degree of care must be exercised by those engaged in the generation and distribution of electricity. (18 Am. Jur. 443, sec. 48; *Ellis v. Ashton and St. Anthony Power Co.*, 41 Ida. 106, 238 Pac. 517; *Younie v. Blackfoot Light and Power Co.*, 15

Ida. 56, 96 Pac. 193; *Gagnon v. St. Maries Light and Power Co.*, 26 Ida. 87, 141 Pac. 88.)

"The care to be exercised by an electric company with respect to its wires is such as a reasonably careful and prudent person, having in view the dangers to be avoided and the likelihood of injury therefrom, would exercise under the circumstances in order to prevent injury." (*Scott v. Pac. Power and Light Co.*, (Wash.) 35 Pac. (2d) 749.)

"If but little danger is incurred, as, for instance, when the wires carry only a harmless electric current, such, for instance, as the telephone or telegraph current, only ordinary care may be required. While if the wires carry a strong and dangerous current of electricity, so that negligence will be likely to result in serious accidents, and perhaps death, or if a harmless wire is in dangerous proximity to a high tension wire, a very high degree of care, indeed the highest that human prudence is equal to, is necessary." (*Scott v. Pac. Power and Light Co., supra,* quoting from Crosswell, *Law of Electricity,* 205, sec. 234.)

Applying these rules, the court in the case of *Southwestern Light and Power Co.*, (Okla.) 249 Pac. 961, held the company liable under the following facts: It maintained a high voltage power line along a public highway past what is referred to as the old Taylor home. On the poles supporting the high voltage wire, the company had attached a telephone line. This line had been discontinued, and the wire, having broken, was rolled into hoop fashion, its ends hanging onto a barbed wire gate which was part of a wire fence enclosing some lots east of the Taylor house. The Taylor house was set on fire from some unknown cause, which fire attracted plaintiff's son and other citizens to the place of the fire. The son stood near the wire fence, with his hands on the top wire, and about 150 feet from the gate with which the broken telephone wire was in contact. The fire caused the high voltage wire to fall onto the telephone wire, thus charging the latter, and in turn, the barbed wire, electrocuting the son 150 feet away.

The company's defense, like in the case at bar, was that it exercised the proper degree of care, and that the

proof established "that its business was conducted in the regular and ordinary course." Among other things, the court says:

"The telephone wire was so situated and attached to the pole that contact was a probable and natural consequence from the separation (fall) of the high voltage wires. The sending of the deadly voltage along the barb wire was a diversion of the deadly current from its normal and usual zone of travel, as the result of a condition of which the appellant stands charged with notice."

"The burning of the Taylor house was not the proximate cause of the son's death; it was an incident in the chain of circumstances which resulted in the untimely death of the son."

"The negligence of the defendant was in permitting a condition which sent the deadly current out of its usual zone of travel. It is not material what concurring cause or means set the dangers in motion, unless the concurring superseded the negligence of the defendant." (Underscoring mine.)

In the case of *Laurel Light and Railway Co.*, (Miss.) 102 So. 1, the facts were these: The company's uninsulated, high-tension wire passed through a tree. A boy climbed into the tree carrying a hay baling wire which he dropped over or across the charged transmission wire, and called to a companion to grab hold of the dangling ends of the baling wire. The company was held liable for the resulting injuries to the latter boy, on the ground that it should have anticipated that boys might do just what was done. (See also, *Ahern v. Oregon Telegraph and Telephone Co.*, (Ore.) 33 Pac. 403; *Parsons v. Appalachian Elec. Power Co.*, (W. Va.) 176 S. E. 862, 100 A. L. R. 615.)

In the light of these authorities, and viewing the actions of the chicken hawks in retrospect, it can be seen that the appellant's negligence in permitting the uninsulated guy wire to remain in contact with the wires in the fence, was a decidedly contributing factor in bringing harm to respondent. The record shows that hawks abound in the territory through which appellant's power

line passes, and that upon other occasions birds caused disturbances in the transmission of electricity by way of these wires. While, from an anticipatory point of view, the exact manner in which these hawks interfered with the wires upon this occasion may seem unusual or extraordinary, viewed in retrospect it can not be said to have been unforeseeable.

"A result of the actor's tortious conduct may be one which, either in its extent or the manner in which or the sequence of events through which the conduct operates to bring about the harm, is altogether different from the result which the actor at the time of his negligence recognized or should have recognized as likely to result therefrom. None the less, after the event, such a result may not appear to the court or jury to be so highly extraordinary as to prevent the actor's conduct from being a substantial factor in bringing it about." (Restatement, 2 Torts 1165, sec. 433, p. 1167; see also, Restatement, 2 Torts 1165, sec. 431, p. 1159.)

Nor can the appellant, under these circumstances and conditions, be absolved from liability by the mere fact that it had spaced its wires in accordance with the accepted standard.

"General practice in maintaining and operating electric power line will not excuse negligent act unless such practice is consistent with due care." (*McCormick v. Great Western Power Co.,* (Cal.) 26 Pac. (2d) 322; *Lim Ben v. Pac. Gas and Elec. Co.,* (Cal. App.) 281 Pac. 634.)

Further, the evidence shows,—indeed, it is admitted, that the guy wire was uninsulated, and that for probably two years or longer, it was in contact with the wires of the fence. And, as already stated, it is indisputable that but for this contact between the uninsulated guy wire with the fence wires, electricity from the transmission line, however it might have bridged the space between the transmission wire and the guy wire, would not have reached or injured respondent's property. But it is argued that "The precaution taken by the industry as disclosed by the evidence is to protect the public by protecting its guy wires in maintaining ample spacing between them

and transmission wires. To require that the precaution of this spacing be again uselessly employed between the harmless guy wire and the fence, would entail a tremendous expense upon the industry and a very great inconvenience to farmers along the lines."

It is further argued that because the power line must run along the side of the highway, and in close proximity to the farmer's fence, it is impracticable to space between the guy wire and the fence; and that it is equally impracticable to insulate these guy wires because of the prohibitive expense, and that therefore appellant is exempt from the charge of negligence in the case at bar, and that the reasoning in *Le Deau v. Northern Pac. Ry. Co.*, 19 Ida. 711, 115 Pac. 502, supports this contention. With this argument we cannot agree. The facts in the Le Deau case were that the Railway Company in constructing its road had made a cut about twenty feet deep through the side of a mountain. From the top or upper edge of this cut the mountain sloped upward and backward, and it was from a point quite a distance up this slope that a rock started to roll down, and after a number of bounds, struck and broke through the window of the company's car at that moment on the track in the cut, striking and injuring the plaintiff, who was sitting in the car.

"No one saw the rock start, and no one pretends to testify as to the cause which started it, or the place from which it fell. * * *

"It is clear from this evidence that the rock did not fall from the side of the cut. It was evidently not an overhanging or loose rock left on the face of the cut through which the track was laid.

"It is clear, therefore, that the accident did not occur by reason of anything which the appellant or its agents or employees did, nor did it occur through any defect in the appliances which appellant was using, or the instrumentalities it was employing as a common carrier."

In short, the court found that the defendant had nothing whatever to do with the cause of the rock's fall. The only factor in the accident, contributed by the company, was the fact that it had built its road through the moun-

tains, and, in the interest of the development of this intermountain country, the court refused to characterize that as negligence.

Contrast those facts and conditions with the facts in the case at bar: Here the agency which wrought the havoc to respondent's property, was created and set in motion by the appellant, and for its purposes was brought into close proximity with the respondent's property. In addition, the evidence establishes that the appellant negligently permitted a condition to arise in the appliance with which it conducted this dangerous agency into the vicinity of respondent's property, which made it inevitable that injury would result to the respondent if, in any manner, the electricity should escape from the high voltage transmission wire to the guy wire.

True, the court in the Le Deau case in part exonerates the railway company from negligence because of the impracticability of requiring it to construct a retaining wall above its right-of-way to prevent rocks from rolling onto such right-of-way from the mountain side above it. The expense of constructing such a miniature Chinese wall might in many cases be prohibitive. Not so here. The fact insulation of its guy wires, or maintaining a sufficient space between such wires and the wire fence might have been expensive would not excuse appellant from using the highest degree of care in protecting the same. (*McLaughlin v. Louisville Elect. Light Co.*, (Ky.) 37 S. W. 851, 34 L. R. A. 812.)

The authorities are numerous that where, conditions or location considered, it would be dangerous to have electric wires uninsulated, failure to insulate would be negligence. (*McCormick v. Great Western Power Co.*, (Cal.) 8 Pac. (2d) 145; *Stanley v. Lander*, (Cal. App.) 39 Pac. (2d) 225; *Scott v. Pac. Power & Light Co.*, (Wash.) 35 Pac. (2d) 749.)

Considering all of the facts shown by the evidence in this case, the question whether the appellant was negligent, and whether its negligence was a proximate cause of the respondent's injuries, was not one of law for the court, but of fact for the jury, and the jury having by its

verdict determined that question against the appellant, their finding should not be reversed.

The judgment is affirmed.

Costs to respondents.

Givens, J., concurs.

Ailshie, J., deeming himself disqualified did not participate and Koelsch, D. J., sat in his stead.

MORGAN, J. (Concurring)—I concur in the affirmance of the judgment, but am not in accord with the part of the opinion which says, "and in viewing the actions of the chicken hawks in retrospect, it can be seen that the appellant's negligence in permitting the uninsulated guy wire to remain in contact with the wires in the fence, was a decidedly contributing factor in bringing harm to respondent."

If it was necessary to view what occurred in retrospect, in order to affirm the judgment, I would vote to reverse it. One should not be held liable in damages for his conduct if he could not have foreseen it might be dangerous to others, or their property.

While appellant could not foresee that the two hawks would so cooperate as to transfer the electrical current from its transmission line to its guy wire, it was charged with notice that this might be done by any one or more of many causes. Knowing this, its negligence consisted in maintaining the guy wire in contact with the wires of the fence, for it also knew that should something occur to transfer the electrical current from the transmission wire to the guy wire, the guy wire would transmit it to the wires of the fence rendering them exceedingly dangerous to life and property.

This negligence was not merely a "contributing factor in bringing harm to respondent"; it was the proximate cause of the destruction of, and damage to, his property.

BUDGE, C. J. (Dissenting)—August 25, 1939, two chicken hawks flew into a 60,000 volt electrical transmission line being maintained by appellant, The Washington

Water Power Company, a corporation, along the east line fence of Peter L. Beck, in places the fence being nailed to the transmission line poles. At the pole where the hawks flew into the transmission line the three wires of the fence were in direct contact with a metal guy wire fastened near the top of the pole and anchored in the ground some fifteen feet north of the pole, a space of 28 inches existed between the transmission wire and the guy wire at their closest point. The hawks flying into the line in some manner spanned this 28 inch space and caused a contact to be made between one of the transmission wires and the guy wire and the electrical current was thereby transmitted through the guy wire to the fence, an "explosion" resulted and fire was started in the grass and combustible material along the fences of Mr. Beck and along the fences of respondent, Irving Maxon Chase, Administrator with the Will Annexed of the Estate of Ella G. Libby, deceased, which fence was joined to the fence of Mr. Beck. The fire quickly spread to buildings and personal property of respondent Chase and consumed the same, for which respondent Chase sought judgment, on the ground of alleged negligence, for $2,900. Respondent Phoenix Fire Insurance Company intervened seeking judgment for $529.00 by reason of having paid respondent Chase that sum upon a fire insurance policy on some of the buildings destroyed.

Judgment was returned in favor of Respondent Chase for $1,000. and in favor of respondent Phoenix Fire Insurance Company for $529. From this judgment appellant prosecutes this appeal.

The assignments of error, that the court erred in not granting appellant's motion for nonsuit made at the close of respondents' case, and at the close of all the evidence, and appellants' request for an instruction directing the jury to find for the appellant, raise but one main contention, namely, that the evidence is insufficient to sustain a verdict and judgment for either respondent.

Respondent relies in the main upon the pronouncement of this court in *Ellis v. Ashton & St. Anthony P. Co.*, 41 Ida. 106; *Younie v. Blackfoot Light & Power Co.*, 15 Ida. 56; and *Gagnon v. St. Maries Light & Power Co.*, 26 Ida.

87, that electrical companies are held to the highest degree of care practicable to avoid injury to persons or property, which proposition is well established. Appellant urges, and correctly so, that it is not sufficient to show that an accident occurred; there must be some evidence of negligence. (*Thomas v. Pocatello Power Co.*, 7 Ida. 435; *Charles Le Deau v. Northern Pac. Ry. Co.*, 19 Ida. 711; *Oklahoma Gas & Electric Co. v. Wilson*, 45 Pac. (2d) 750.) Considering these two propositions together and from an examination of the authorities it appears that although electrical companies are held to the highest degree of care practicable to avoid injury to persons or property, still there must be some evidence of negligence tending to show the electrical company has not exercised that degree of care practicable to avoid injury to persons or property. The inference, no one seeing what actually occurred, which the evidence tends to establish, is that two hawks while fighting and with claws interlocked flew into the wires spanning the not less than 28 inch distance existing between a charged wire and the guy wire thus closing the circuit and carrying the voltage down the guy wire to the fence. True, the possibility of such occurrence might have been eliminated by eliminating the guy wire or by eliminating the electrical line. There is no evidence that insulating the guy wire was either proper or would have prevented the occurrence. Had the distance between the guy wire and charged wire been increased there is still possibility of a sufficient number of hawks bridging the gap. The primary cause of the accident was the hawks making contact with the charged wire and the guy wire completing a circuit, and at a point close to the pole to which the wires were attached. There is nothing in the evidence to indicate that appellant was negligent in not foreseeing that two hawks might close the circuit in the manner inferred. It appears that the precaution taken by the industry is to protect the public by protecting its guy wires by maintaining ample spacing between them and the transmission wires. Such foresight as would have been required to anticipate the occurrence herein appears to be without the realm of probabilities and beyond the highest degree of care

practicable to avoid injury to persons or property contemplated by the rule announced in *Ellis v. Ashton & St. Anthony P. Co., supra.* The contact made by the two hawks diverting the curent down the guy wire, which was the primary cause of the injury, was an unheard of freak accident that could not be foreseen or contemplated by the exercise of the highest possible degree of care and caution by appellant. The construction of the system was that universally used in the distribution of electric current and was in compliance with instructions received by the company for the building of its system. It was the freak contact made by the hawks, unheard of and unknown so far as we are able to find in a search of authorities, which caused the damage. The position in which the hawks were when they flew into the space between the charged wire and the uncharged guy wire, by no stretch of the imagination could have been anticipated or guarded against. There was no question of fact to submit to the jury because there was absolutely no evidence of negligence. It was solely and only a question of law for the court and the motion for nonsuit should have been granted. The effect of the majority opinion makes those engaged in the transmission of electrical energy insurers against any and all damage or injury which may result from its transmission and distribution.

HOLDEN, J. (Dissenting)—From the circumstance two hawks were found electrocuted (with talons interlocked) at a pole forming a part of the transmission line of the appellant, it is inferred the hawks had been fighting, and from the same circumstance it is further inferred while fighting the hawks flew into a space (constituting standard construction) separating the transmission line and guy wire, and that the spread of the wings of both hawks formed a contact between the transmission line and guy wire, thereby conducting the electric current from the transmission line through the hawks into the guy wire and on into a fence, resulting in starting a fire which caused the injury complained of. It is admitted by all parties it was the bridging, by the hawks (in the manner above pointed out), of the gap between the trans-

mission line and guy wire, that set in motion the destructive agency which caused the damage. Hence, the decisive question is: Was appellant bound to anticipate and guard against the remote possibility two hawks, while fighting, would fly into the above described gap in such a manner as to set the said agency (60,000 volts of electricity) in motion? "An electric company is bound only to anticipate such combinations of circumstances and accidents and injuries therefrom as it may reasonably forecast as likely to happen, taking into account its past experience, and the experience and practice of others in similar situations, together with what is inherently probable in the condition of the wires as they relate to its business." (*Kinkead's Commentaries on Tort*, vol. 1, sec. 261, p. 559.)

There is no evidence in the record indicating, or from which it might be inferred, appellant should have anticipated such a "freak" accident would likely happen. It is my view, therefore, appellant is not liable.