## KOCH v. TELLURIDE POWER CO. et al.

No. 7230.   Decided August 15, 1949.   (209 P. 2d 241.)

See 29 C. J. S., Electricity, sec. 47. Employee injured, remedy for, see note, 166 A. L. R. 813. See, also, 58 Am. Jur. 609.

*Gustin & Richards, Brent T. Lynch, Jr.,* Salt Lake City, for appellant.

*Ray, Quinney & Nebeker, W. J. O'Connor, Jr.,* Salt Lake City, for respondent.

LATIMER, Justice.

This is an action to recover damages for personal injuries received by plaintiff while he was testing certain electrical transformers located on the property of A. E. Kipps, Robert R. Landrum, and George W. Clemenson, doing business as Metal Producers. The trial court granted defendants' motion for nonsuit after plaintiff had rested and this appeal is taken from the judgment of dismissal. The principal assignment of error requires a review of the facts.

The above named individuals were transacting business as Metal Producers and had a lease upon certain mining properties known and designated as the Horn Silver Mine. The electrical transformers with which we are concerned were located upon a wooden platform approximately 18″ above ground level. There were three transformers set on the platform and they were in line in an easterly and westerly direction. They were approximately 38 inches in diameter and 7 feet high and were separated from each other by spaces of from 12 to 14 inches. On top of each transformer was a primary bushing. The transformers and other electrical equipment were enclosed in the following manner: There was a railing about 4½ to 5 feet in height on the south and east sides of the enclosure; the transformer bank formed the north side; and, a sharp rise of mountains protected the west side. Near the southwest corner of the enclosure was a utility pole which marked the end of the Telluride Power Company's facilities. A current of 44,000

volts was furnished to this utility pole and from this point into the mine, the circuits ran through Metal Producers' facilities.

For some time prior to the accident, the western-most transformer had been out of repair and use. Apparently, the other two had been functioning and meeting the requirements of the mine. Shortly before the accident, one of the two remaining transformers ceased to function. Metal Producers had obtained two smaller transformers which they intended to use in place of the defective ones and it was necessary to hook up the new transformers in order to keep the mining property operating.

On the 18th day of October, 1946, the plaintiff was employed by Metal Producers to supervise the removal of the defective transformer and the installation of the two borrowed ones. Plaintiff was an experienced electrician and this particular employment was consistent with knowledge he had acquired. Pursuant to a telephone call from the Metal Producers left at plaintiff's home on the evening before, plaintiff reported for work at the mining property on the 18th day of October, 1946, at about 8:00 a. m. He reported to the mine superintendent and was introduced to a Mr. Terry, the mine foreman, who was to furnish helpers to assist with the installation.

The defendant, Telluride Power Company, is a public utility furnishing electrical energy throughout the southern part of the state. Its high tension line of 44,000 volts was used to furnish the electrical energy for operating the electrical equipment at the mine. From the end of defendant's line, the energy was carried by wires to a switch and from this switch to the primary bushing on top of the transformer. The path of the electricity was from the bushing through the transformers (where the voltage was reduced to 440 volts) to the electrical equipment in the mine.

The defendant, Ashworth, was general manager of the Telluride Power Company. He had been working for the

company for many years and was a college graduate with a degree in electrical and mechanical engineering. He was familiar with the operation and function of transformers and had seen those involved in this accident, and knew the dangers of working around wires charged with high voltage electrical current.

Plaintiff likewise was familiar with the electrical equipment upon which he was working and the characteristics and dangers of electrical energy. He, however, obtained his knowledge through employment in the industry. In 1929 he was employed by a power company and during his year's employment with that company, he learned to service and repair electrical equipment. In 1930 he went to work for the defendant, Telluride Power Company, and remained with the company until 1946. In the latter year, he voluntarily terminated his employment. During part of his employment, with the defendant company, he was a subordinate to the defendant, Ashworth. During his 17 years of service in the electrical industry he improved his standing with his employers and increased his knowledge of electricity and electrical installation. He became Division Superintendent of the defendant company and in this capacity was continuously dealing with electrical energy and electrical equipment.

Both plaintiff, and defendant Ashworth, could be classified as thoroughly acquainted with dangers incident to working with defective equipment. We need not concern ourselves too much with Ashworth's qualifications, as plaintiff's testimony establishes that he possessed the necessary knowledge and skill to appreciate that extreme care was necessary to protect one working around high voltage electricity. In dealing with his own knowledge and qualifications, plaintiff testified that he understood the construction and operation of transformers. He knew how to test for defects and how to correct deficiencies. He knew how to connect and disconnect the wire, bushing bars, ground wires, and other safety appliances that might be used. He

knew the insulating effect of oil and appreciated that its withdrawal from the transformer would increase the probability of electrical energy reaching the outside wall of the transformer. He knew the reasons for grounding the transformers and was aware of the fact that if the ground wire were not connected, the fuse protection could not be relied upon and the walls of the transformer might be energized. And he knew that contact with an energized wall could be fatal. He was well qualified for the job for which he was employed and the accident was caused not by his lack of understanding of the latent force or dangerous power of electricity but by a mental lapse on the part of one or both of two qualified operators.

The record is not clear as to what dealings the mine company had with the defendant company, prior to the morning of the accident, so we start the sequence of events with plaintiff's conversation with defendant Ashworth. Apparently Ashworth talked over the telephone with plaintiff, while he, plaintiff, was in the process of changing the transformers. During this conversation, Ashworth asked plaintiff to check the horn gaps for clearance, and to take a sample of oil from the two transformers which had been borrowed to replace the defective ones. Plaintiff checked and found the horn gaps properly spaced, took the sample of oil as requested and reported his findings to Ashworth. Ashworth in reply stated he was coming out to the mine and then plaintiff requested that Ashworth bring some oil and insulators with him.

After this conversation plaintiff and his helpers disconnected the primary, secondary and ground wires and drained the oil from the center transformer. This was the one to be replaced. The ground wire on this transformer was removed by one of the other employees of the mine under express directions from plaintiff.

About 10:30 a. m., Ashworth arrived at the mine. By this time plaintiff and his crew were just ready to commence

moving the transformer. Plaintiff informed Ashworth of the steps that had been taken to get the transformer in readiness for moving and Ashworth asked plaintiff if he (plaintiff) had run a test on the transformer.

Plaintiff replied that he had not. The test being discussed, required all wire circuits to be completed and the ground wire connected. With the installation completely wired, and grounded, if the switch were closed and the equipment not in proper working order, the fuse would burn out and break the circuit. Apparently, Ashworth was anxious to have the test made and the following is a version of the conversation between Ashworth and plaintiff as testified to by plaintiff:

Ashworth said:
"I want a test run on this transformer."

Plaintiff responded:
"No, Mr. Ashworth. I am satisfied the transformer is shot."

Ashworth replied:
"Well, I want a test run on this, go up and connect the primary."

Plaintiff answered:
"Okeh."

Plaintiff then proceeded to reconnect the primary wires to the primary bushing. In order to do this, he climbed up a ladder and worked on the top of the transformer. While the employees who had been working with plaintiff were immediately available, no one thought to have the ground wire reconnected or to replace the oil. After completing the connection, with primary bushings, plaintiff then climbed back down on the ground and asked Ashworth if everything was clear and if he wanted plaintiff to close the switch. Ashworth replied:

"yes, everything is okeh, you can close the switch."

Plaintiff then closed the switch and proceeded over to where Ashworth was standing near the east transformer and asked if Ashworth could hear any vibration. Ashworth replied in the affirmative and placed his hand on the most easterly transformer. Plaintiff then proceeded around Ashworth to the defective transformer with the intention of placing his hand on the outside wall of the transformer. Whether or not plaintiff touched the wall is uncertain but in any event, the energy from the transformer passed through his body into the ground and severly burned him. Had the ground wire been connected, and the oil replaced, plaintiff would not have been injured.

Plaintiff filed an application with the Industrial Commission for compensation and an award was made against the Metal Producers and its insurance carrier. At a later date this action was commenced with the consent and permission of the insurance carrier.

While the parties have suggested a number of legal principles dealing with the relationship existing between plaintiff and defendants, we find it unnecessary to discuss their respective contentions. Under any of the proposed relationships, plaintiff is precluded from recovering, if he is guilty of contributory negligence as a matter of law, with one exception. This would be in the event both he and Ashworth were found to be employees of the same employer. Even a finding such as that would not help plaintiff as under such a status his sole and exclusive remedy would be by proceedings pursuant to the provisions of the Workmen's Compensation Act. This remedy has been afforded him. See *Masich* v. *U. S. Smelting and Refining Co.*, 113 Utah 101, 191 P. 2d 612.

Before discussing the question of plaintiff's contributory negligence, we dispose of his contention that the defendant company was negligent because it continued to furnish electrical energy to the facilities of Metal Producers after Ashworth, its general manager, had learned that there was defective equipment at the mine. Un-

doubtedly, the general rule is that a company furnishing power to an owner or occupant of property is liable for damages for supplying current after having knowledge that defective and dangerous appliances are being used on the premises of the owner or occupant. This rule, however, does not apply in this instance because the flow of electricity had been interrupted by means of a switch and the power had been cut off from the defective equipment. The power was turned back into the facilities of the owner for a special purpose of permitting the defective parts to be tested, and the person who was responsible for energizing the defective equipment was the plaintiff in this action. It should be apparent, therefore, that the negligence in this case was not in permitting the current to charge the wires of the defendant company up to the utility pole but was in closing the circuit so that the current could flow into the defective transformer without taking precautions to protect persons who might have cause to be in close proximity to the transformer.

We have concluded the facts show that plaintiff was guilty of negligence as a matter of law; that his negligence solely or proximately contributed to his injury, and, that he is therefore precluded from recovering in this action. While he contends he had the right to rely for protection on Ashworth's superior knowledge, we do not so find. Conceding that Ashworth had a degree in electrical engineering and that at one time he was appellant's immediate superior, neither of these elements created a relationship which would permit appellant to avoid the consequences of his own lack of due care. If plaintiff could rely on Ashworth's knowledge, such reliance would be founded on the concept that appellant did not know of the dangers involved in testing equipment, that Ashworth did and that he was duty bound to inform plaintiff of the hazards to be anticipated. The record, rather than establishing that plaintiff did not know of the risks he was subjected to, is conclusive that plaintiff was competent in every respect for the task he was performing and that he knew

and appreciated the dangers connected with this particular employment. While training in college may be of distinct advantage such an education does not conclusively establish that those who are trained on a job and acquire knowledge by practical experience are less learned in either the science of electricity or dangers incident to working with such a deadly and imperceptible force than are college graduates. If Ashworth knew the risk involved in turning the current into the transformer without oil and without a ground circuit, so did plaintiff. Plaintiff could no more rely on Ashworth's knowledge to protect him than Ashworth could rely on plaintiff's experience to properly protect himself.

As we piece together the sequence of events in this unfortunate accident, it becomes apparent that there are four factors which played a part in contributing to appellant's injuries. These are: The lack of oil in the transformer, the failure to connect a ground wire, the energizing of the defective equipment by closing the switch, and the placing of the hand so closely to the defective transformer as to permit the current to pass from the energized walls to plaintiff's body. Plaintiff participated in each and all of these events so that if all reasonable persons would conclude that in doing the things he did, plaintiff did not act as a prudent person under the circumstances then and there existing, then the court properly entered an order of non-suit.

The following facts persuade us to conclude that all reasonable persons would conclude plaintiff was negligent. He had been working with several other employees and had expressly directed their activities, including a direction that the ground wire be removed and that the oil be drained from the defective transformer. He knew he was working with and around 44,000 volts and that high tension electricity was extremely dangerous. When Ashworth requested a test on the transformer appellant knew each and every step that must be taken to properly and safely conduct the test. He knew which connections must be made to permit the test to succeed and those which would add some measure

of safety to the task to be performed. He was certain as to which transformer was defective and knew the test would fail if the ground wire was not connected. He know that electricity will flow from energized appliances through the body to the ground if a path of less resistance is not furnished. He knew that when he closed the switch that the wires and appliances in the "switch rack" area would be energized and that all persons working in or around the equipment would be in a highly dangerous place and should be warned to stand clear. His statement to or request of Ashworth was susceptible of being misunderstood. It could have been taken by Ashworth, to merely be certain to see that all personnel working in the proximity of the switch rack were in the clear. As a matter of fact other employees working with plaintiff interpreted it in that manner and moved back so as to be farther removed from danger. The answer given by Ashworth was not an assurance that any connections had been made or that the transformers had been completely and properly rewired. The record does not establish that Ashworth was requested to or did make an inspection of the wiring system before plaintiff closed the switch. Plaintiff possessed every bit of information that was known by Ashworth and the places where wires had been disconnected should have been better known to him. Plaintiff was in charge of the work and was authorized to direct the other workmen in what duties to perform. He was not directed to turn the job over to Ashworth or to accept orders from him and Ashworth had no authority to assume control of the installation or of the workmen employed by the Mining Company. Plaintiff directed the disconnection of the ground wire and the withdrawal of the oil, but he did not direct the refilling of the transformer or the reconnection of the ground wire. Neither did he hear Ashworth make any request to have the work performed. Plaintiff did not leave the vicinity of the transformer and was in a position where, with little effort, he could have seen the activities of everyone working around the switch rack. There is no evidence in the record which would indicate that Ashworth assumed

authority to give directions to employees of the Mining Company; that he made any connections; that he represented that he would perform any part of the work; or that he in any way held himself out as having made any of the connections. The other workmen did not hear Ashworth giving any orders and they received all of their instructions from the plaintiff. While Ashworth touched the transformer that plaintiff supposed was functioning properly, he made no request or suggestion that plaintiff touch the defective one. This act was entirely voluntary on the part of plaintiff and without suggestion, direction, or request from Ashworth.

From these facts we must necessarily conclude that if Ashworth were negligent in what he did or failed to do, then plaintiff is likewise negligent. If Ashworth had any duty of making certain that the test could be carried on with safety then the same, if not a greater, burden was on the plaintiff. Plaintiff's duty to use due care was in no way lessened by Ashworth's presence. Conceding that Ashworth projected himself into the project as a volunteer, by so doing he did not assume the role of a guarantor of plaintiff's safety. By participating in the test, Ashworth did not have placed upon him the sole burden of making certain that all precautionary measures had been taken to ensure the safety of plaintiff. Plaintiff had some reasonable duty to protect himself.

Not having exercised that degree of care required of a reasonably prudent person of his experience, background, and knowledge, plaintiff is guilty of contributory negligence proximately contributing to his injury. Accordingly, the judgment is affirmed.

PRATT, C. J., and WADE, WOLFE and McDONOUGH, JJ., concur.