305 P.2d 740

Beatrice P. RUSSELL and Walter C. Musgrave, State Insurance Manager, State of Idaho, Plaintiffs-Appellants,

v.

CITY OF IDAHO FALLS, a municipal corporation, and Union Pacific Railroad Company, a corporation, Defendants-Respondents.

No. 8431.

Supreme Court of Idaho.

Dec. 24, 1956.

Merrill & Merrill, Pocatello, Glenn A.
Coughlan, Boise, L. H. Merrill, Idaho Falls,
for appellants.

Albaugh, Bloem, Barnard & Smith, Idaho Falls, for respondent City of Idaho Falls.

L. H. Anderson, E. C. Phoenix and M. R. Smyser, Pocatello, Bryan P. Leverich, Salt Lake City, Utah, for respondent Union Pac. R. Co.

SMITH, Justice.

Respondent Union Pacific Railroad Company hereinafter sometimes is called the Railroad, and respondent City of Idaho Falls, the City.

Appellant Beatrice P. Russell seeks recovery of damages for the death of her husband Charles F. Russell, which occurred August 31, 1954, by electrocution allegedly caused by the negligence of respondents. Appellant Walter C. Musgrave, as Manager of State Insurance Fund, asserts subrogated rights of recovery of the amounts of workmen's compensation benefits the Fund has paid and become obligated to pay, growing out of the death of decedent as a compensation covered employee of Idaho Stockyards Company.

Respondent Railroad maintains certain pens, chutes and other facilities within respondent City for loading, unloading, feeding and caring for livestock, situate in and upon right of way property which respondent Railroad holds under lease from another railroad company. The Railroad, by contract effective May 1, 1943, contracted the operation of said stockyard facilities to Denver Union Stock Yard Company and The Ogden Union Stockyards Company. The contract was renewed each period of two years, and supplements were added thereto from time to time.

Denver Union Stock Yard Company, at its expense, and as its facilities, during the

year 1943, constructed on the leased premises a cinder block office building, and, during 1946-1947, a frame metal covered barn building situate in the near vicinity of the office building. The construction included the electric wiring and installations in said buildings.

February 21, 1951, Idaho Stockyards Company, a Utah corporation, a subsidiary of The Ogden Union Stockyards Company and Denver Union Stock Yard Company, was substituted as the contractor in the stockyards operating contract, and was operating the stockyards for the Railroad August 31, 1954, at the time of the accident which resulted in the death of Charles F. Russell.

Idaho Stockyards Company, operating under said contract with the Railroad, loaded, unloaded, watered, fed, rested, and otherwise cared for livestock handled by the Railroad; also cleaned and sanded railroad cars and performed minor repairs and maintenance on the stockyards property.

The Stockyards Company also received livestock trucked in by individuals, feeding and caring for such livestock in the railroad stockyards, preparatory to the livestock being delivered by the Stockyards Company to the adjoining Idaho Livestock Commission Company (an auction company). The Stockyards Company also received from purchasers their livestock bought at the Commission Company in cases where they desired their newly purchased livestock shipped therefrom by rail.

Decedent Russell at the time of his death was an employee of Idaho Stockyards Company.

The City of Idaho Falls owns and operates its electric distribution system. The source of supply of electric current for lighting the stockyard facilities, in use August 31, 1954, was installed by the City about two years after the construction of the office building. The City at that time at the request of the customer Railroad, which pays for all electric current used at the stockyards, installed a transformer on an electric power pole situate on the Railroad's leased right of way property. The City's electric lines connected to the customer Railroad's lines immediately below the transformer, through a meter wired by the Railroad. The lines extended from the transformer to the office building and from there to the metal barn. The City claimed no interest in the lines furnishing current from the transformer pole to the customer Railroad.

The City grounded the neutral of the transformer to a ground rod driven at the base of the pole, but did not test such ground at any time prior to Russell's death. There was a ground rod situate at the office building. No ground was provided at the metal barn although the National Electric Code, which the Railroad claims to have

followed and the City had adopted, required all metal buildings to be grounded and fused.

The electric switch mechanism at the metal barn was contained in a four-inch metal box attached onto the wall, with the electric conduit extending from above into the switch-box. Two electric toggle switches inside the metal box were attached to the box by screws, and a plastic wall-type switch-box cover was attached by four screws,—two attached to each switch.

August 12, 1954, an electric storm occurred in Idaho Falls and vicinity, which allegedly caused damage to the transformer, indicated by the lights in the stockyards becoming dim. The City's electricians were cognizant of damage even though the lights burned brightly when the transformer was re-fused.

Sometime prior to August 31, 1954, the Railroad's employees piled pieces of metal scrap equipment against the northeast corner of the metal barn and adjacent to a post of wood set in concrete about a foot distant from such corner of the barn. When Russell and one Jorgensen, both employees of Idaho Stockyards Company, came to work about 8:00 a. m., the morning of August 31, 1954, the wood post was on fire. They got a water hose and, by sprinkling water on and around the post, put out the fire. They then opened the metal barn door without experiencing any electric shock.

During the next two hours Russell and Jorgensen cared for and fed some considerable number of sheep. Those sheep had been trucked in by individual owners to the Stockyards Company preparatory to delivery of the sheep to the nearby Idaho Livestock Commission Company. The two men after working about two hours feeding the sheep, went to the office of their employer; after about five minutes Russell left and went out to the barn. A few minutes later a man came to the office stating that a man was lying out by the barn. Jorgensen went out and found Russell in a sitting position against the northeast corner of the metal barn and but a few inches from the post which again was on fire, smouldering. Russell had been electrocuted.

The City upon being notified immediately sent electricians to the scene of the accident; they replaced the transformer with a new one.

The City upon testing the old transformer at its shop found that 1400 volts of electricity would go through the secondary coils on the neutral line, although the maximum should not have exceeded 220 volts. The City then caused the defective transformer to be dismantled. This dismantling revealed a short circuit between the primary and secondary coils of the transformer, being a clean puncture from the first turn of the primary coil, to the ninth turn of the secondary coil. The fact that

the short was from the first turn of the primary coil indicated its cause to be due to a condition of over-voltage, attributed to lightning during the storm of August 12, 1954. The fact that the lights connected in the circuit became dim, was a warning that something was wrong in the transformer which re-fusing would not correct.

The trial court at the close of the evidence denied respondent City's motion for a directed verdict. The trial court pursuant to respondent Railroad's motion for a directed verdict, instructed the jury to return a verdict in favor of the Railroad for the reason that the Railroad was shown to be the statutory employer of decedent Russell. The case, as to respondent City was submitted to the jury. The jury thereupon returned a verdict in favor of respondents, and judgment was rendered accordingly. Appellants have appealed from the judgment.

Appellants, by grouping of their nineteen assignments, urge error committed by the trial court in particulars hereinafter set forth:

First: Appellants assign error of the trial court in granting the motion for a directed verdict in favor of respondent Railroad.

The trial court, by Instruction No. 22, instructed the jury to the effect that under the provisions of the workmen's compensation law, applied to the facts in the case,

the Railroad was shown to be the statutory employer of Russell and not a third party tort feasor; that the Railroad could not be held liable in the action and that the jury return a verdict in its favor.

The portions of the contract, deemed pertinent here, between the Railroad and the Stockyards Company effective May 1, 1943, recite the requirement of the Railroad, in connection with its transportation of livestock, to water, unload, feed, rest and load livestock from time to time; that it has provided stockyards facilities at Idaho Falls for such purposes and that the Contractor (Stockyards Companies) represents its ability to operate the stockyards to the satisfaction of the Railroad.

The Railroad, under such contract, agrees to maintain, repair and renew the stockyards facilities, maintain existing electric wire lines and furnish all electric current for illumination, and all water in connection with the operation, of such facilities. The Contractor agrees to furnish feed, and to unload, water, feed, rest, care for and reload shipments of livestock in transit; load shipments of livestock originating at Idaho Falls, unload shipments destined thereto and keep records, the Contractor to be paid for the feed furnished and for its services by the Railroad.

The contract, in addition to the care of livestock in which the Railroad has a shipping or other interest, allows the Con-

tractor to feed, care for and render service in reference to livestock in which the Railroad has no such interest, and to charge and receive compensation therefor from the owners, or from Idaho Livestock Commission Company (auction company) adjacent to the stockyards facilities.

The contract recognizes that certain livestock unloaded by the Contractor at the stockyards will be turned over by the Contractor to Idaho Livestock Commission Company, but the Contractor must obtain written authorization of the Railroad before such livestock shall be permitted to leave the Contractor's possession.

The contract provides that the Railroad shall furnish to the local manager of the Contractor free transportation over its railroad in certain areas when purchasing feed for use at the stockyards facilities or otherwise looking after the interests of the Contractor.

The contract further provides, that in the event any agent or employee of the Contractor, employed in connection with the stockyards facilities, is objectionable to the Railroad for any reason, then upon written request of the Railroad, the Contractor shall promptly relieve any such agent or employee from further service at the stockyards facilities.

Supplements to the contract, relating mainly to changes in rates of remuneration to be paid by the Railroad thereunder, were entered into from time to time by the parties; also, the contract was kept in force by extension riders executed from time to time by the parties.

The record shows that the primary employer, Idaho Stockyards Company, fed livestock for the Railroad in instances where the livestock was being transported by, or had been consigned to, the Railroad, in which instances the Railroad paid for those services.

The record further shows that the Stockyards Company also fed livestock for individuals, farmers and others, who delivered livestock to the stockyards, for care, and delivery to, and auction sale by, Idaho Livestock Commission Company at its adjoining premises, in which instances the Commission Company paid the Stockyards Company for those services.

The services performed in both such instances whether in interstate or intrastate commerce, nevertheless are performed pursuant to and as authorized by the contract.

The morning of August 31, 1954, Russell and his coemployee Jorgensen spent their first two hours at work in feeding and otherwise caring for the sheep, then in the livestock pens, which had been trucked in by individuals for care, and later delivery to the Commission Company. Russell and Jorgensen then went to the office of their employer, Stockyards Company, during a lull in their work. A short time later Rus-

sell's electrocution occurred on his employer's premises, at the northeast corner of the metal barn at the immediate vicinity of the smouldering post. It thusly appears that the work being performed by Russell and Jorgensen relating to those particular sheep at the times in question was of intrastate classification covered by the workmen's compensation law.

■ We conclude that respondent Railroad Company was the statutory employer of decedent Russell at the time of his fatal accident, pursuant to the provisions of I.C. § 72–1010, a part of the workmen's compensation law. That section provides that "employer" includes "the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor, or for any other reason, is not the direct employer of the workman there employed." In re Fisk, 40 Idaho 304, 232 P. 569; Palmer v. J. A. Terteling & Sons, 52 Idaho 170, 16 P.2d 221; Moon v. Ervin, 64 Idaho 464, 133 P.2d 933; Gifford v. Nottingham, 68 Idaho 330, 193 P.2d 831; McGee v. Koontz, 70 Idaho 507, 223 P.2d 686.

The trial court properly granted the motion for a directed verdict in favor of the Railroad.

Second: Appellants assign error of the trial court in submitting to the jury the question of contributory negligence of decedent Russell by Instruction No. 10 defining contributory negligence, Instruction No. 15 setting out the duty of care on decedent's part and Instruction No. 23 dealing with contributory negligence.

Both the City and the Railroad alleged that Russell, knowing of imminent danger, failed to exercise reasonable care for his own safety by putting out a fire on a post near the metal barn caused by contact between the post and the allegedly electrified building, which post at the time of the accident again was burning from the same cause; that Russell knew or in the exercise of reasonable care should have known of danger near the building but failed to exercise care commensurate with such knowledge and potential danger.

Jorgensen, who was Russell's coworker the morning of August 31, 1954, did not observe anything unusual when he and Russell opened and entered the barn that morning. The first fire at the post, which he and Russell extinguished with water from a hose, did not cause investigation or concern by any one, including Mr. Justensen, the manager of the Stockyards Company, who was present when the first fire was extinguished. Russell and Jorgensen went about their work, after putting out the fire, and at no time prior to Russell's death did either of them observe any electrical disturbance or any evidence of danger.

Any contributory negligence on the part of Russell, in the light of the related cir-

cumstances, would of necessity rest in mere conjecture; for one would have to speculate that Russell not only had sufficient knowledge of electricity to have known the facts, but that he appreciated the peril, which respondents alleged, and that he failed to exercise due care commensurate with imminent potential danger from contact with the energized metal barn. Splinter v. City of Nampa, 70 Idaho 287, 296, 215 P.2d 999, 17 A.L.R.2d 665; Hooton v. City of Burley, 70 Idaho 369, 375, 219 P.2d 651; 38 Am.Jur., Negligence, sec. 188, p. 864.

Respondents presented no evidence directed to the allegations of contributory negligence on the part of decedent Russell; and such does not appear from the evidence introduced by appellants. The evidence is insufficient to sustain such charge of contributory negligence. Knauf v. Dover Lumber Co., 20 Idaho 773, 120 P. 157; Madron v. McCoy, 63 Idaho 703, 126 P.2d 566; Bell v. Carlson, 75 Idaho 193, 270 P.2d 420; Larsen v. Jerome Cooperative Creamery, 76 Idaho 439, 283 P.2d 1096.

▇ The burden of proving contributory negligence rests on the party pleading it as defense, unless it is made to appear from the evidence introduced by the plaintiff, I.C. § 5-816; Cogswell v. C. C. Anderson Stores Co., 68 Idaho 205, 192 P.2d 383; Koch v. Elkins, 71 Idaho 50, 225 P.2d 457; Bell v. Carlson, supra; Larson v. Jerome Cooperative Creamery, supra.

▇ The trial court erred in submitting to the jury, by said Instructions, the question of decedent Russell's contributory negligence.

Third: Appellants assign error of the trial court in giving to the jury Instructions Nos. 16 and 15 and in failing to give appellants' requested Instruction No. 11.

Instruction No. 16 stated the presumption of due care on the part of all parties, respondents and decedent Russell, at the time and immediately preceding the death of decedent, and the duty of the jury to determine the preponderance of the evidence, in the event there is evidence that conflicts with such presumption. Instruction No. 15 stated the duty of every person to exercise ordinary care at all times to avoid placing himself or others in danger, and to avoid injury to himself or others. Appellants' requested Instruction No. 11 was designed to instruct the jury that until the contrary is proven, decedent Russell is presumed to have been exercising due care for the protection of his person and preservation of his life at the time of the accident, arising from the instinct of self-preservation.

▇ Instructions Nos. 16 and 15 were not necessary since they would tend only to confuse the jury. The theory of the abstract principles of law stated in those instructions is amply covered by the instructions on the burden of proof.

■ The trial court did not commit error in refusing to give appellants' requested Instruction No. 11 on the presumption of due care exercised by Russell, because there was no proof of contributory negligence on his part and that issue was improperly submitted to the jury.

Fourth: Appellants assign error of the trial court in giving to the jury Instruction No. 23. The salient divisions of that instruction (excluding the question of contributory negligence of decedent Russell in which respect we have hereinbefore ruled) are to the effect: (1) that before the jury be justified in returning a verdict in appellants' favor it must appear that respondent City was negligent in one or more of the particulars alleged in the complaint and that such negligence was the proximate cause of decedent Russell's death and resulting damages to appellants; (2) that even though the jury believe that respondent City was negligent, and such negligence was not "the proximate cause of, or a contributing proximate cause of his [decedent's] death" and appellants' resulting damages, then the verdict must be for respondent City.

The question of decedent Russell's contributory negligence having been improperly submitted to the jury, the balance of the instruction deals solely with the proximate cause and only one proximate cause, i. e., negligence, if such there was, on the part of respondent City which the jury must find, as the cause of the death before finding for appellants.

The instruction told the jury in effect that even though they find negligence on the part of the Railroad *and* the City, that nevertheless, the City's negligence not being the *sole* proximate cause of the death, they could not find for appellants. The instruction disregards the theory of appellants' case, i. e., joint and concurrent negligence of both the City and the Railroad.

■ The dismissal of the Railroad from the action does not alter the theory of joint and concurrent negligence, since liability for a tort committed by several may be treated as joint or several at the election of the aggrieved party; and the fact that one wrongdoer may not be held accountable to the injured party, as for instance, because of its immunity under the workmen's compensation law, will not exempt the other from tort liability. 52 Am. Jur., Torts, sec. 110, p. 448; Lorang v. Hays, 69 Idaho 440, 209 P.2d 733. The dismissal of the Railroad from the action was not on the ground of lack of negligence, but because of the trial court's finding, herein affirmed, that the Railroad, as decedent's statutory "employer" was immune from tort liability. Its dismissal from the case, however, did not affect the character of the City and the Railroad as alleged joint and concurrent tort feasors. Nelson v. West Coast Dairy Co., 5 Wash.2d 284, 105

P.2d 76, 130 A.L.R. 606. Hence, upon dismissal of the Railroad, the theory to be applied to the liability of the City is, that negligence on its part need not be the sole cause of the injury, but may be considered with the negligence of another or others jointly and concurrently committed, though only the City be held liable for the damage. It is sufficient that the negligence of respondent City, if such there was, concurring with one or more efficient causes, other than negligence of the decedent, was the proximate cause or an efficient proximate cause, of the injury. Miller v. Gooding Highway Dist., 55 Idaho 258, 41 P.2d 625; Burkland v. Oregon Short Line R. Co., 56 Idaho 703, 58 P.2d 773; Valles v. Union Pac. R. Co., 72 Idaho 231, 238 P.2d 1154; Clark v. Tarr, 75 Idaho 251, 270 P.2d 1016; 38 Am.Jur., Negligence, sec. 64, p. 717; 65 C.J.S., Negligence, § 110, pp. 674–684.

▆ The applicable theories are expressed in the jury instruction approved in the case of Valles v. Union Pac. R. Co., supra [72 Idaho 231, 238 P.2d 1158], as follows:

" 'You are instructed that the negligence of any one of the defendants in order to render such defendant liable, need not be the sole cause of an injury. It is sufficient that his negligence, concurring with one or more efficient causes, other than the plaintiff's fault, is the proximate cause of the injury. Accordingly, where several causes com-bine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient proximate cause, without which the injury would not have resulted, and that such other cause is not attributable to the negligence of the plaintiff. It is no defense to any one of the several defendants that the injury would not have resulted from his negligence alone, without the concurrent negligence or wrongful act of the other defendants.' "
And in Clark v. Tarr, supra [75 Idaho 251, 270 P.2d 1017], the rule is stated:

"There may be several tort-feasors whose actions enter into the chain of causation resulting in the ultimate injury and liability may attach to one or all as contributing to the proximate cause."

Appellants' said assignment of error relating to Instruction No. 23 is well taken.

▆ Fifth: Appellants assign error of the trial court in refusing to give their requested Instructions Nos. 10, 13 and 15, and in giving Instruction No. 17 relating to the liability of respondent City.

Appellants' requested Instruction No. 10 was designed to submit to the jury the question of whether the City's transformer because of a defect or because of its defective condition, allowed excessive voltage to enter the lines going to the metal barn,

which, if found by the jury, may be considered as evidence of negligence on the City's part.

Appellants' requested Instruction No. 13 was designed to instruct the jury that if they found that a high voltage of electricity came through the City's transformer, and if the City failed to install a proper protective device to shunt the excessive current into the ground, then the jury may find that the City was negligent.

Appellants' requested Instructions Nos. 10 and 13 were intended to be directed to such facts and circumstances consonant with the pleadings and the evidence. However, those instructions would have failed to instruct the jury in regard to knowledge on the part of the City of the factual defects referred to, i. e., that the City knew or in the exercise of due care should have known of the defective condition of its transformer thereby permitting the high voltage of electricity to pass through the transformer to the metal barn. The trial court, therefore, properly refused said requested instructions.

In Younie v. Blackfoot Light and Water Co., 15 Idaho 56, 74, 96 P. 193, 194, is to be found the following:

"It appears that it was an act of negligence in the defendant [supplier of electricity] in permitting such a heavy voltage [1,000 volts or more] to go into the barn, and that if a proper fuse wire had been used—wire that would have burned out or melted in case of an excessive current coming on the wire—the melting of the wire would have broken the current and no harm would have been done."

Short v. Central Louisiana Electric Co., La.App., 36 So.2d 658, announces the rule that where an electric company knows of a severe storm and consequent damage to its equipment, it is negligent if it fails to use extraordinary care particularly in investigation and inspection of the equipment. See also Martin v. Northern States Power Co., 245 Minn. 454, 72 N.W.2d 867; Arkansas Power & Light Co. v. Butterworth, 222 Ark. 67, 258 S.W.2d 36.

Appellants' requested Instruction No. 15 reads to the effect that pursuant to certain sections of the Revised Code of the City of Idaho Falls it is the duty of the City to inspect all electric wiring and apparatus installed "in premises in the City;" also, that it is the duty of one furnishing electrical energy to another to refuse to furnish the electricity when he knows, or in the exercise of reasonable care should have known, that the customer's wiring and apparatus are not safe; and that if by inspection the City knew, or should have known that the wiring in the metal barn was dangerous or did not meet standard safety requirements, but nevertheless continued to furnish electricity thereto, then the jury may consider

such action as negligence on the part of the City.

Appellants did not plead the existence of any private statute or ordinance referred to in the requested instruction, as required by I.C. § 5–809.

■ Further, appellants did not offer in evidence any such private statute or ordinance, though not pleaded; for the action as to the City is not one for violation of a private statute or ordinance but is predicated upon the City's negligence, in which instance the private statute or ordinance may become admissible without being pleaded, since the violation thereof may be shown as evidence of negligence. Opitz v. Schenck, 178 Cal. 636, 174 P. 40; Martin v. Shea, 182 Cal. 130, 187 P. 23; Szopieray v. West Berkeley Express & Draying Co., 194 Cal. 106, 227 P. 720; Goss v. Pacific Motor Co., 85 Cal.App. 455, 259 P. 455.

■ The trial court properly refused the aforesaid portions of requested Instruction No. 15.

■ A portion of appellants' requested Instruction No. 15 was designed to instruct the jury that it is the duty of one furnishing electricity to refuse to furnish it, when he knows, or in the exercise of reasonable care should have known, that the wiring or appliances of the customer are not safe. We deem such to be a correct statement of the law, Bellefuil v. Willmar Gas Co., 243 Minn. 123, 66 N.W.2d 779; Null

v. Electric Power Board of City of Nashville, Tenn.App., 210 S.W.2d 490; Dabbs v. Tennessee Valley Authority, 194 Tenn. 185, 250 S.W.2d 67; Carroway v. Carolina Power & Light Company, 226 S.C. 237, 84 S.E.2d 728; Jelf v. Cottonwood Falls Gas Co., 162 Kan. 713, 178 P.2d 992; Koch v. Telluride Power Co., 116 Utah 237, 209 P.2d 241; 134 A.L.R., Annotation, p. 507; 29 C.J.S., Electricity, § 57, p. 611. Here, however, the rule does not apply and the trial court properly refused so to instruct the jury, because the proof fails to show that the City either had knowledge of the defects in the customer's wiring and installations or should have known thereof. In that connection we deem the testimony of the City's Electrical Inspector, relating to this duty to inspect electric wiring and installations of the customer, to be incompetent since there was a failure of proof of the private statute or ordinances of the City or other requirement, in that regard.

■ Appellants assign error of the trial court in giving Instruction No. 17 to the effect that a supplier of electricity is not responsible for the condition of a customer's lines unless it has actual knowledge that the lines are defective; also that the supplier is not required to inspect the customer's lines at the time of connection or thereafter.

Such instruction states the rule announced by the weight of authority, and

therefore the trial court properly gave it. Null v. Electric Power Board of City of Nashville, Tenn.App., supra; Carroway v. Carolina Power & Light Company, S.C., supra; Dabbs v. Tennessee Valley Authority, Tenn., supra; 134 A.L.R., Annotation, p. 507; 29 C.J.S., Electricity, § 57, p. 611.

Sixth: Appellants assign error of the trial court directed to its ruling which set up a "reasonably adequate" standard of care regarding installation of electrical equipment. The assignment is based on testimony of respondent City's Superintendent of Electrical Distribution and rulings of the trial court as follows:

"Q. Did you see a faucet at the outside of the building [office building of Idaho Stockyards Company]? A. Yes sir.

\* \* \* \* \* \*

"Q. What is the relative value of a ground rod and a water pipe as an efficient ground?

"Mr. Anderson: I think, your Honor, that is immaterial.

"The Court: Objection sustained. \* \* \* The question is adequate ground, regardless. \* \* \* Reasonably adequate.

"Mr. Wesley F. Merrill: May I rephrase my question?

"Q. (By Mr. Wesley F. Merrill) Which makes the better ground, Mr. Moore, a driven rod or a water grounding from a water pipe? A. Most generally a water pipe—

"The Court: Just a minute, Mr. Moore.

"Mr. Anderson: I think it's still immaterial.

"The Court: It's the same objection. The same ruling, the objection is sustained.

"Q. (By Mr. Wesley F. Merrill) Mr. Moore, in your experience as—in forty years, if you had your choice between a driven ground and a water pipe, which would you ground to?

"Mr. Barnard: Objected to as immaterial. All that's required here is a reasonably safe ground, not one that might be the very best.

"The Court: It's the same objection.

"Mr. Wesley F. Merrill: \* \* \* It is my understanding that an electrical installation must be installed as safely as possible; that if one ground is preferable to another, then the preferable ground must be used.

"The Court: That's not my understanding.

"Mr. Wesley F. Merrill: I see. And that is the basis of your ruling?

"The Court: That's right. * * * A reasonably adequate ground.

"Q. (By Mr. Wesley F. Merrill) Was there a ground, Mr. Moore, to this water pipe at the office building? A. Not that I saw."

Appellants' position is that the safer practice in observance of the highest degree of care compelled selection of the water pipe at the office building, as the "most efficient" grounding device, as compared to the "reasonably adequate" driven ground rod.

In Younie v. Blackfoot Light and Water Co., 15 Idaho 56, 68, 96 P. 193, 195, the rule is stated:

"Electricity is recognized as one of the most destructive agencies we have, and the highest degree of care and diligence is required by those who are operating electrical plants, in order to avoid injury to person and property."

This rule has been reiterated frequently by this Court. Eaton v. City of Weiser, 12 Idaho 544, 86 P. 541; Gagnon v. St. Maries Light & Power Co., 26 Idaho 87, 141 P. 88; Ellis v. Ashton & St. Anthony Power Company, 41 Idaho 106, 238 P. 517; Chase v. Washington Water Power Co., 62 Idaho 298, 111 P.2d 872; Probart v. Idaho Power Co., 74 Idaho 119, 258 P.2d 361. Appellants' said assignment is well taken.

Seventh: Appellants contend that the trial court erred in refusing to give to the jury requested Instructions Nos. 2, 3, 4, 5 and 7.

Requested Instructions Nos. 2 and 3 were designed to instruct the jury in effect that if they found that respondent Railroad had the duty to maintain the electric wires and apparatus existing at the office building and metal barn at the time of Russell's death, and if the jury found that such wiring and apparatus, or lack thereof, as it existed had been negligently maintained or allowed to remain, and were unsafe, then the jury may consider those facts as evidence of negligence on the part of the Railroad.

The Instructions fall within the purview of the charge of negligence on the part of the Railroad set out in appellants' complaint.

The Railroad contends, since the Stockyards Company constructed the office building and metal barn, including the electric wiring and installations therein, that the Railroad has no responsibility relating thereto. The Railroad in effect contends that negligence of the Stockyards Company, if any there was, relating to the electric installations which it caused to be made at the office building and metal barn, and any lack of observance on its part of safety regulations in regard thereto cannot be attributed to the Railroad, since the latter did not make those installations in the first instance.

484

■ Such contention of the Railroad is untenable under its existing contract with the Stockyards Company. The Railroad may require any agent or employee of the Stockyards Company relieved from further service at the stockyards facility. The Railroad in effect was operating the stockyards at the time of Russell's death, under a service contract through a controlled agent. For such reasons, the negligence, if any there was, of the agent Stockyards Company, became the negligence of the principal, the Railroad, to be considered as a contributing proximate cause under the theory of joint and concurrent negligence, if such there was, on the part of both the City and the Railroad, even though the Railroad be not a party of the action; therefore the trial court erred in refusing the requested Instructions Nos. 2 and 3.

■ Requested Instructions Nos. 4 and 5, both were designed to instruct the jury that should they find the Railroad negligent in the respects set out in requested Instructions Nos. 2 and 3, then the jury may find against the Railroad. The trial court properly refused those requested instructions, since the Railroad, by reason of being a statutory employer, is exempt from the tort liability.

■ Appellants' requested Instruction No. 7 set out specifically the age and life expectancy of Russell at the time his death occurred, to be considered by the jury in arriving at an award of damages, should they consider damages. The court upon refusal to give such instructions thereupon instructed the jury merely that "age and life expectancy may be considered by a jury in arriving at an award in a death case."

The parties to this action stipulated the life expectancy of decedent in accordance with the American Experience Table of Mortality. Decedent's life expectancy was a matter pertinent to the inquiry before the jury and therefore appellants properly requested an instruction thereon in accordance with the stipulation.

The judgment is affirmed as to respondent Union Pacific Railroad Company. The judgment is reversed as to respondent City of Idaho Falls and the cause remanded with instructions to grant a new trial. Appellants are awarded their costs against respondent City of Idaho Falls. Respondent Union Pacific Railroad Company is awarded its costs against appellants.

TAYLOR, C. J., and PORTER, J., concur.

KEETON, J., with whom BECKWITH, D. J., concurs.

I concur in the opinion with the exception of the holding that requested Instruction No. 11 was properly refused. It should have been given. Where there are no eye witnesses to the death, the jury should be instructed that the decedent is presumed to have exercised care for his own safety.